**Scott FOLB, Plaintiff,**

v.

**MOTION PICTURE INDUSTRY PENSION & HEALTH PLANS, et al., Defendants.**

**No. CV 97–1663 RAP (CWx).**

United States District Court, C.D. California.

July 8, 1998.

John C. Taylor, Timothy J. Wheeler, Mark T. Quigley, Greene Broillet Taylor Wheeler & Panish, Santa Monica, CA, Douglas J. Rovens, Rovens Lamb & Yocca, Los Angeles, CA, for Plaintiff.

Gordon E. Krischer, Catherine B. Hagen, Larry A. Walraven, Brent J. North, Andrea Restivo, O'Melveny & Myers, Los Angeles, CA, for Defendants.

**ORDER ON PLAINTIFF'S OBJECTIONS TO ORDER AFTER HEARING OF MAGISTRATE JUDGE ON MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY DEBORAH SAXE, ESQ. AND BY HADSELL & STORMER PURSUANT TO SUBPOENAS**

PAEZ, District Judge.

## I.

### *Introduction and Factual Background*

Plaintiff Scott Folb contends that defendants discriminated against him on the basis of gender and retaliated against him because he objected when Directors of the Motion Picture Industry Pension & Health Plans (the "Plans") violated fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendants allegedly relied on a complaint that Folb had sexually harassed another employee, Vivian Vasquez, as a pretext to discharge him for his whistle-blowing activities.

The Plans allegedly promoted Folb several times while he worked for them. Folb became the Administrative Director in January 1996. After Folb took certain actions regarding Vasquez' access to the new computer software system, Vasquez allegedly filed a complaint about his management action. Folb claims Vasquez filed her sexual harassment complaint only after she was told plaintiff had discretion to make the managerial decision about which she had initially complained. Folb's complaint describes in detail the events leading to defendants' decision to terminate Folb's employment, including the Plans' allegedly anomalous decision to hire Deborah Saxe, an outside attorney, to investigate Vasquez' sexual harassment claim.

With respect to his alleged whistle-blowing activities, Folb claims he objected to and reported, among other things: (1) use of Clinicorp Managed Health Care (and its successor, Alignis, Inc.), as the Plans' exclusive chiropractic service provider when defendant Frank Dickenson's wife was an officer of Clinicorp and then Alignis; (2) improper payments to Clinicorp and Alignis; (3) failure to conduct a bidding process and payment of non-competitive rates; (4) exposure of the Plans to taxes, fees and unnecessary expenditure by continued use of Alignis despite its violation of California's Knox–Keene Health Care Services Act; (5) unsolicited 85% increase in the composite rate paid to Alignis on HMO contracts; (6) demands from the Plans' directors that companies in which they had an interest or with which they were affiliated be given preferential treatment; (7) use of Plan assets to pay for personal expenses; and (8) retention of counsel with a conflict of interest, refusal to accept insurer's

defense, and engagement of separate counsel at excessive rates.

The Court previously denied plaintiff's motion to remand this action to state court because plaintiff's first claim for relief relates to and is preempted by ERISA. In addition, the Court denied plaintiff's motion to remand his supplemental state law claims because to do so would require unnecessary duplication of effort and waste judicial resources.

Pending before the Court are Plaintiff's Objections to Order after Hearing of Magistrate Judge on Motion to Compel Production of Documents by Deborah Saxe, Esq. and by Hadsell & Stormer pursuant to Subpoenas ("Objections"). Magistrate Judge Woehrle denied plaintiff's motion to compel production of a mediation brief and related correspondence regarding settlement negotiations between the Plans and Vivian Vasquez, the employee who accused Folb of sexual harassment.

In approximately February 1997, Vasquez and the Plans attended a formal mediation with a neutral in an attempt to settle Vasquez' potential claims against defendants arising out of the alleged sexual harassment. Vasquez and the Plans signed a contract agreeing to maintain the confidentiality of the mediation and all statements made in it. Vasquez' counsel prepared a mediation brief and provided copies to opposing counsel and to the mediator. The parties apparently did not reach an agreement during the mediation. After the mediation, counsel presumably engaged in further settlement negotiations and the parties ultimately settled Vasquez' potential claims against the Plans. At some point, counsel for the Plans, Lawrence Michaels of Mitchell, Silberberg & Knupp provided Saxe with a copy of the mediation brief. Neither Vasquez nor her attorneys, Hadsell & Stormer, authorized the Plans to provide a copy of the mediation brief to Saxe.

Saxe refused to produce the mediation brief in response to Folb's subpoena, asserting that the confidentiality of the brief is protected under FED. R. EVID. 408 and CAL. EVID. CODE § 1119. Likewise, Hadsell & Stormer refused to produce either the mediation brief or documents relating to settlement negotiations with the Plans on behalf of Vasquez. Folb sought to compel production of (1) Vasquez' mediation brief; (2) correspondence between Vasquez' counsel and counsel for the Plans regarding mediation or other settlement discussions; and (3) notes to the file prepared by Vasquez' counsel regarding settlement communications. Folb argues that the Plans are trying to take a position in this litigation that is inconsistent with the position he believes they took in settlement negotiations with Vasquez. Folb suggests that the Plans will argue that he was properly terminated for sexually harassing Vasquez, despite the fact that they may have argued in mediation or settlement negotiations with Vasquez that she was never sexually harassed at all. Magistrate Judge Woehrle denied Folb's motion to compel production, and Folb filed the pending Objections.

Upon consideration of the parties' moving, opposition, reply and supplemental papers, Hadsell & Stormer and Saxe's separate oppositions to plaintiff's objections and supplemental papers, and the oral arguments of counsel, the Court considers Folb's Objections and modifies the magistrate judge's order in accordance with FED. R. CIV. P. 72. While the Court concludes that the magistrate judge did not err in ruling that the motion to compel production of the mediation brief should be denied, the legal foundation for that ruling must comport with the analysis set forth in the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (recognizing psychotherapist-patient privilege under FED. R. EVID. 501). In addition, the Court finds that Folb is entitled to discover information relating to any settlement negotiations conducted after the conclusion of the formal mediation session.

## II.

### *Discussion*

#### A. Standard of Review

Under 28 U.S.C. § 636(b)(1)(A), a district court may reconsider a magistrate judge's determination of non-dispositive, pretrial matters if the magistrate's order is

"clearly erroneous or contrary to law." Similarly, FED. R. CIV. P. 72(a) provides that "the district court judge to whom the case is assigned shall consider [timely] objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." FED. R. CIV. P. 72(a).[1] To conclude that a magistrate judge's decision is clearly erroneous, the district court must arrive at a "definite and firm conviction that a mistake has been committed." *Federal Sav. & Loan Ins. Corp. v. Commonwealth Land Title Ins. Co.*, 130 F.R.D. 507 (D.D.C.1990).[2]

■ FED. R. CIV. P. 72 requires the objecting party to file and serve objections within 10 days after being served with the magistrate judge's order. A party who fails to file timely objections to a magistrate judge's ruling on a nondispositive motion within ten days forfeits the right to challenge the ruling. *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 n. 1 (9th Cir.1996).

## B. Application

### 1. Timeliness of Plaintiff's Objections

Under FED. R. CIV. P. 6(e), where service of an order is by mail, "3 days shall be added to the prescribed period." Here, the magistrate judge's order was served by mail, so plaintiff had thirteen days to file and serve objections. In addition, "[w]hen the period of time prescribed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." FED. R. CIV. P. 6(a) (including Thanksgiving Day as "legal holiday"). Magistrate Judge

Woehrle's order was served on November 20, 1997. Excluding weekends and Thanksgiving Day, the last day to file and serve objections was December 10, 1997. Consequently, plaintiff's Objections filed and served on December 10, 1997 were timely.

### 2. Applicable Law

Because the parties have not fully briefed the issue of ERISA preemption, the Court assumes, without deciding, that plaintiff's state law claims are not preempted by ERISA.[3] All of plaintiff's claims are premised on his contentions that he never sexually harassed Ms. Vasquez and that he was wrongfully terminated. Plaintiff's motion to compel seeks information relating to the mediation and settlement negotiations between the Plans and Vasquez. Plaintiff hypothesizes that the Plans asserted in settlement negotiations with Vasquez that Folb did not sexually harass her at all. Such information would be relevant here because it would tend to make it more likely that the Plans terminated Folb for some reason other than that he had sexually harassed Vasquez. Because the mediation brief and the communications relating to settlement negotiations between the Plans and Vasquez are arguably relevant to both plaintiff's federal and state law claims, the Court must determine whether state or federal law controls disclosure.

■ Federal Rule of Evidence 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statuto-

---

1. Local Rule 3.3.01 of the Local Rules for the Central District of California also provides for review of those portions of a magistrate judge's decision that are "clearly erroneous or contrary to law."

2. Because "issues of relevancy ... are traditionally left to the discretion of the trial court," such issues do not come under the "clearly erroneous" standard set forth in § 636(b)(1)(A). *Geophysical Systems Corp. v. Raytheon Co., Inc.*, 117 F.R.D. 646, 647 (C.D.Cal.1987) (reversing magistrate judge's order denying motion to compel discovery). Instead, where the magistrate's decision concerns an evidentiary question of relevancy, "the Court must review the magistrate's order with an eye toward the broad standard of

relevance in the discovery context. Thus, the standard of review in most instances is not the explicit statutory standard, but the clearly implicit standard of abuse of discretion." *Id.; see also In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the High Court of Justice, Chancery Division, England*, 147 F.R.D. 223, 225 (C.D.Cal.1993) (citing *Geophysical*, 117 F.R.D. at 647).

3. Plaintiff asserts state law claims for wrongful termination in violation of public policy—gender discrimination; breach of written contract; breach of oral contract; breach of implied contract; intentional and negligent infliction of emotional distress; invasion of privacy; and fraud.

ry authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law applies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof.shall be determined in accordance with State law.

The language of Rule 501 raises a difficult question regarding which law shall apply when evidence is relevant both to "an element of a claim or defense" controlled by state law and to a federal law claim. As the Supreme Court noted in *Jaffee*, "there is disagreement concerning the proper rule in cases such as this in which both federal and state claims are asserted in federal court and the relevant evidence would be privileged under state law but not under federal law." *Jaffee*, 518 U.S. at 16 n. 15, 116 S.Ct. 1923. That disagreement appears to center on the proper interpretation of Rule 501's mandate that the federal courts recognize state privileges only in cases in which "State law provides the rule of decision." FED. R. EVID. 501.

In the Ninth Circuit, however, the question appears to have been resolved. "In federal question cases with pendent state law claims, the law of privilege is governed by 'the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'" *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 n. 10 (9th Cir. 1992) (refusing to apply California litigation privilege in copyright action with pendent state law claims); *see also Roberts v. Heim*, 123 F.R.D. 614, 620–21 (reviewing cases holding federal common law of privileges governs all privilege issues in federal question case with pendent state law claims). The Ninth Circuit's position is supported by the sugges-

tion in the Advisory Committee Notes to Rule 501 that state law applies only in diversity cases. Other recent cases addressing the issue have likewise concluded that the federal law of privilege is paramount in federal question cases "even if the witness-testimony is relevant to a pendent state law count which may be controlled by a contrary state law privilege."[4] *Hancock v. Hobbs*, 967 F.2d 462, 467 (11th Cir.1992) (per curiam) (following predominant view); *see also Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir.1992) (following *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455 (N.D.Cal.1978)); *Smith v. Smith*, 154 F.R.D. 661, 670–71 (N.D.Tex. 1994) (considering, without ruling on, issue of federal mediation privilege).

The leading commentators are in accord. Weinstein succinctly suggests that "in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation." 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 501.02[3][b] (Matthew Bender 2d ed.1997) (citing *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal.1978)). Like Weinstein, Wright & Graham assert that the simplest resolution of the problem is to conclude that because the provision requiring federal courts to look to state law of privileges in certain circumstances is an exception to the general rule that federal privilege law applies in federal court, "courts should always follow the federal rule when the same evidence is relevant to both a state and federal claim." 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5434 at 862 (1980). Although Wright & Graham note that most early decisions have taken that approach, they go on to suggest that "the strength of these precedents is somewhat diluted by the practice of some courts of applying state law under the guise that it is simply being used to 'guide' development of the federal common law." *Id.*, § 5434 (1998 Supp. at 473).

---

4. Indeed, concerns about whether state or federal privilege law should apply are heightened where the federal question presented is one of exclusive federal jurisdiction. Consequently, where evidence is relevant to both state and federal questions, the federal common law of privileges should apply to protect the exclusive federal concerns central to ERISA even if Rule 501 might otherwise require application of state law to pendent state claims.

Here, Magistrate Judge Woehrle's order takes the approach of these more recent cases, relying on California law as a matter of comity to shape the federal common law. Magistrate Judge Woehrle held that although state law privileges do not govern in cases presenting federal questions, California's mediation privilege, CAL. EVID. CODE § 1119, applies in this action as a matter of comity because it is consistent with federal interests.[5] *Folb v. Motion Picture Industry Pension and Health Plans,* CV 97–1663 RAP (CWx), March 18, 1998 Civil Minutes Hon. Carla Woehrle, United States Magistrate Judge (citing *Pagano v. Oroville Hospital,* 145 F.R.D. 683, 687–88 (E.D.Cal.1993) (holding pendent state law claims governed by federal privilege law but state law should be applied where provisions of state privilege can be harmonized with federal discovery law); *Cook v. Yellow Freight System, Inc.,* 132 F.R.D. 548, 550 (E.D.Cal.1990) (holding federal law of privilege applies in federal question cases and applying underlying policy of Rule 408 to protect documents related to settlement negotiations from discovery); *Kelly v. City of San Jose,* 114 F.R.D. 653, 656 (N.D.Cal.1987) (holding federal courts should look to interests behind state privileges as a matter of comity and adopting balancing test for official information privilege concerning information in police files)).

In light of the foregoing controlling and persuasive authority and the counsel of the leading treatises on the Federal Rules of Evidence, the Court concludes that Magistrate Judge Woehrle erred as a matter of law in applying the California mediation privilege "as a matter of comity."[6] While much of Judge Woehrle's reasoning runs parallel to the elements of the test set forth in *Jaffee* and its predecessors, federal courts are bound to strictly apply that test in adopting a

new federal privilege and may not conduct a more ad hoc analysis of the relationship between the experience of the forum state and various federal interests. To the extent the authority relied upon by the magistrate judge suggests federal courts should look to the law of the forum state as a matter of comity in determining the contours of federal privilege law, that authority is disapproved by *Jaffee. See Jackson v. County of Sacramento,* 175 F.R.D. 653 (E.D.Cal.1997) (correctly holding *Cook* and *Pagano* overruled by *Jaffee* to the extent those cases suggest federal privilege law is informed primarily by the law of the forum state as a matter of comity rather than by the law of the 50 states in the aggregate as evidence of reason and experience).

■ Because the federal common law of privileges governs both federal and pendent state law claims in federal question cases, the Court must decide whether to adopt a federal mediation privilege under FED. R. EVID. 501.

### 3. Federal Mediation Privilege

■ The federal courts are authorized to define new privileges based on interpretation of "common law principles ... in the light of reason and experience." *Jaffee,* 518 U.S. at 8, 116 S.Ct. 1923.

> The general mandate of Rule 501 was substituted by the Congress for a set of privilege rules drafted by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Judicial Conference of the United States and by [the Supreme] Court.... In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege. Its

---

**5.** In her March 18, 1998 minute order, Magistrate Judge Woehrle clarified her ruling with respect to the mediation brief and settlement negotiations. In her initial order, issued November 18, 1997, Judge Woehrle simply stated that *Cook,* 132 F.R.D. at 553–54, required a showing of particular relevance to an issue in the litigation to justify breaching the confidentiality of the parties' settlement negotiations. Judge Woehrle concluded that the communications at issue did not "contain relevant information justifying their disclosure." *Folb v. Motion Picture Industry Pen-*

*sion and Health Plans,* CV 97–1663 RAP (CWx), November 18, 1997 Civil Minutes Hon. Carla Woehrle, United States Magistrate Judge.

**6.** As the Court explains below, however, Judge Woehrle was clearly correct that *Jaffee* requires federal courts to consider the experience of the states, including the forum state, in determining whether to recognize a new federal common law privilege. *See Jaffee,* 518 U.S. at 14–15, 116 S.Ct. 1923.

purpose rather was to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis ... and to leave the door open to change.

*Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (internal marks and citations omitted). Nonetheless, that authority must be exercised with caution because the creation of a new privilege is based upon considerations of public policy. In general, the appropriate question is not whether a federal mediation privilege should exist in the abstract, but whether "(1) the need for that privilege is so clear, and (2) the desirable contours of that privilege are so evident, that it is appropriate for this [c]ourt to craft it in common law fashion, under Rule 501." *In re Grand Jury*, 103 F.3d 1140, 1154 (3d Cir.1997) (quoting *Jaffee*, 518 U.S. at 35, 116 S.Ct. 1923 (Scalia, J., dissenting)), *cert. denied, Roe v. U.S.*, —— U.S.——, 117 S.Ct. 2412, 138 L.Ed.2d 177 (1997).

The general rule is that the public is entitled to every person's evidence and that testimonial privileges are disfavored. *Id.* Consequently,

> we start with the primary assumption that there is a general duty to give what testimony one is capable of giving.... Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."

*Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923 (quoting *Trammel*, 445 U.S. at 50, 100 S.Ct. 906). To determine whether an asserted privilege constitutes such a public good, -in light of reason and experience, the Court must consider (1) whether the asserted privilege is "rooted in the imperative need for confidence and trust[;]" (2) whether the privilege would serve public ends; (3) whether the evidentiary detriment caused by exercise of the privilege is modest; and (4) whether denial of the federal privilege would frustrate a parallel privilege adopted by the states. *Id.* at 9–13, 116 S.Ct. 1923.

### a. Need for Confidence and Trust

The existing Federal Rules provide an important backdrop against which to view the role of a mediation privilege in protecting confidentiality and trust between disputants. FED. R. CIV. P. 26(b) provides that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Recognizing the broad sweep of Rule 26, several courts have looked to FED. R. EVID. 408 for protection of settlement negotiations, whether conducted with the assistance of a mediator or in private. *See, e.g., Young v. State Farm Mutual Automobile Ins. Co.*, 169 F.R.D. 72, 76, 79 (S.D.W.V.1996) (weight of authority and Rule 26(b) impose greater burden to establish relevancy to gain discovery of inadmissible, non-privileged confidential settlement documents). Rather than applying Rule 501, the *Young* court and its progenitors have improperly established a heightened standard under Rule 408, and they apply that standard to provide a semi-privilege to confidential settlement agreements and negotiations.

Rule 408 provides that "[e]vidence of conduct or statements made in compromise negotiations is [ ] not admissible." Viewed in combination with FED. R. CIV. P. 26(b), Rule 408 only protects disputants from disclosure of information to the trier of fact, not from discovery by a third party. Consequently, without a federal mediation privilege under Rule 501, information exchanged in a confidential mediation, like any other information, is subject to the liberal discovery rules of the Federal Rules of Civil Procedure, at least where jurisdiction is premised on a federal question and the material sought in discovery is relevant to the federal claims presented.

To determine whether there is a need for confidentiality in mediation proceedings, the Court looks first to judicial and Congressional pronouncements on the issue. No federal court has definitively adopted a mediation privilege as federal common law under Rule 501. In one of the leading cases on the treatment of confidential communications in mediation, however, the Ninth Circuit approved revocation of a subpoena that

would have required a Federal Mediation and Conciliation Service ("FMCS") mediator to testify in a National Labor Relations Board ("NLRB") enforcement proceeding. *National Labor Relations Board v. Joseph Macaluso, Inc.*, 618 F.2d 51, 52 (9th Cir. 1980). Relying on United States policy favoring resolution of labor disputes through collective bargaining and on Congress' creation of government facilities for mediation, the Ninth Circuit in *Macaluso* concluded that "the public interest in maintaining the perceived and actual impartiality of federal mediators does not outweigh the benefits derivable from [the mediator's] testimony." *Id.* at 54 (citing 29 U.S.C. § 171(a)(b)); *see also Local 808, Building Maintenance Service & Railroad Workers v. National Mediation Board*, 888 F.2d 1428, 1435–36 (D.C.Cir.1989) (finding National Mediation Board action was not in bad faith and suggesting confidential and privileged information may be communicated to mediator in private sessions); *Maine Central Railroad Co. v. Brotherhood of Maintenance of Way Employes*, 117 F.R.D. 485 (D.Maine 1987) (following *Macaluso* ).

The Ninth Circuit's conclusion that requiring a federal mediator to disclose information about the mediation proceedings would inevitably impair or destroy the usefulness of the FMCS in future proceedings is equally applicable in the context of private mediation. Admittedly, the express federal interest in preserving a labor mediation system establishes a stronger basis for a mediator privilege in the context of NLRB proceedings. Nonetheless, mediation in other contexts has clearly become a critical alternative to full-blown litigation, providing the parties a more cost-effective method of resolving disputes and allowing the courts to keep up with ever more unmanageable dockets.

Focusing on the role of the mediator, the *Macaluso* court emphasized that "the purpose of excluding mediator testimony . . . is to avoid a breach of impartiality, not a breach of confidentiality." *Macaluso*, 618 F.2d at 56 n. 3. Nevertheless, rules protecting the confidentiality of mediation proceedings and rules protecting the actual or perceived impartiality of mediators serve the same ultimate purpose: encouraging parties to attend mediation and communicate openly and honestly in order to facilitate successful alternative dispute resolution.

> [C]onciliators must maintain a reputation for impartiality, and the parties to conciliation conferences must feel free to talk without any fear that the conciliator may subsequently make disclosures as a witness in some other proceeding, to the possible disadvantage of a party to the conference. If conciliators were permitted or required to testify about their activities, or if the production of notes or reports of their activities could be required, not even the strictest adherence to purely factual matters would prevent the evidence from favoring or seeming to favor one side.

*Id.* at 55. Whether information divulged in mediation proceedings is disclosed through the compelled testimony of a mediator or the compelled disclosure of documents conveyed to or prepared by the mediator, the side most forthcoming in the mediation process is penalized when third parties can discover confidential communications with the mediator. Refusing to establish a privilege to protect confidential communications in mediation proceedings creates an incentive for participants to withhold sensitive information in mediation or refuse to participate at all.

Today, the Court is faced with a somewhat more attenuated concern: whether the "imperative need for confidence and trust" that would support creation of a privilege protecting confidential communications with a mediator should extend so far as to protect all oral and written communications between the parties to a mediation. Before delving into the heart of the matter, we must also clarify what constitutes "mediation" for purposes of the Court's analysis today. Given the facts presented by the parties before the Court, we need only consider whether communications between parties who agreed in writing to participate in a confidential mediation with a neutral third party should be privileged and whether that privilege should extend to communications between the parties after they have concluded their formal mediation with the neutral.

Several commentators have suggested that successful mediation requires open communication between parties to a dispute. *See, e.g.,* Alan Kirtley, "The Mediation Privilege's Transition from Theory to Implementation: Designing a Mediation Privilege Standard to Protect Mediation Participants, the Process and the Public Interest," 1995 J. DISP. RESOL. 1, 8, 16 (collecting sources indicating weight of scholarly authority suggests confidentiality is essential to mediation). Kirtley argues that

> [w]ithout adequate legal protection, a party's candor in mediation might well be 'rewarded' by a discovery request or the revelation of mediation information at trial. A principal purpose of the mediation privilege is to provide mediation parties protection against these downside risks of a failed mediation.

*Id.* at 9–10. In general, however, the academic literature provides little analysis of whether communications disclosed to the opposing party in the course of mediation proceedings should be accorded the same level of protection as private communications between one party and the mediator.

One self-described "heretical" commentator has expressed doubt over the need for a mediation privilege to protect confidentiality in mediation.

> Although most mediators assert that confidentiality is essential to the process, there is no data of which I am aware that supports this claim, and I am dubious that such data could be collected. Moreover, mediation has flourished without recognition of a privilege, most likely on assurance given by the parties and the mediator that they agree to keep mediation matters confidential, their awareness that attempts to use the fruits of mediation for litigation purposes are rare, and that courts, in appropriate instances, will accord mediation evidence Rule 408 and public policy-based protection.

Eric D. Green, "A Heretical View of the Mediation Privilege," 2 OHIO ST. J. ON DISP. RESOL. 1, 32 (1986) (arguing campaign to obtain blanket mediation privilege rests on "faulty logic, inadequate data, and short-sighted professional self-interest.").

Another author takes the position that, while a certain level of confidentiality may be necessary to make mediation effective, "it is wrong to assume that mediation needs absolute confidentiality." Kevin Gibson, "Confidentiality in Mediation: A Moral Reassessment," 1992 J. DISP. RESOL. 25, 26. Gibson suggests that although parties may be more guarded in the absence of confidentiality provisions, open mediations are as successful as confidential mediations when measured by the settlement rate. *Id.* at 41 (citing American Bar Ass'n, ABA Dispute Resolution Directory 145–50 (L. Ray, B. Davis, M. Shuffleton & A. Clare, eds., 1983) (discussing three Ohio programs that settled over 75% of mediated cases)); *see also* Note, "Making Sense of Rules of Privilege under the Structural (Il)logic of the Federal Rules of Evidence," 105 HARV. L. REV. 1339 (1992) (suggesting protection of communications in mediation should take form of confidentiality contracts, procedural limitations on discovery, and use of work product doctrine) [hereinafter "Structural Il(logic)"].

Legal authority on the necessity of protecting confidential communications between the parties to a mediation is sparse. In an early decision by the Second Circuit, the court stated:

> [i]f participants cannot rely on the confidential treatment of everything that transpires during [mediation] sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, noncommital manner more suitable to poker players in a high-stakes game than adversaries attempting to arrive at a just solution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of a program which has led to settlements and withdrawals of some appeals and to the simplification of issues in other appeals, thereby expediting cases at a time when the judicial resources of this Court are sorely taxed.

*Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608 F.2d 928 (2d Cir.1979) (denying request for damages and costs on appeal from district court's confirmation of arbitration award where party seeking costs

**1174**

relied upon confidential information from formal settlement conference with the court's Staff Counsel); *see also Clark v. Stapleton Corp.,* 957 F.2d 745, 746 (10th Cir.1992) (admonishing counsel for breach of confidentiality and holding confidentiality essential to proper functioning of appellate settlement conference program); *Willis v. McGraw,* 177 F.R.D. 632, 633 (S.D.W.V. 1998) (following *Lake Utopia* and denying motion to enforce settlement); Richard Chernick, "Confidentiality in the Mediation Process," CA13 ALI–ABA 603, 606 (1996) (quoting *Lake Utopia* and discussing confidentiality of mediation proceedings under California and federal law).

At least one district court has concluded that confidential information disclosed in alternative dispute resolution ("ADR") proceedings is privileged. *See United States v. Gullo,* 672 F.Supp. 99, 104 (W.D.N.Y.1987). In *Gullo,* the court found that the confidentiality provision in New York's Community Dispute Resolution Centers Program served to ensure the effectiveness and continued existence of the program. *Id.* Looking to Rule 501, the court concluded, on balance, that the privilege afforded under New York law should be recognized by the federal court. *Id.* Having concluded that the information was protected, the *Gullo* court suppressed evidence in a criminal proceeding of all statements made during the dispute resolution process, as well as the terms and conditions of the settlement. *Id.*

Other New York district courts have impliedly approved a federal mediation privilege by sanctioning attorneys for disclosing information revealed during mediation proceedings conducted pursuant to the district court's mediation program. *Bernard v. Galen Group, Inc.,* 901 F.Supp. 778, 782–84 (S.D.N.Y.1995) (sanctioning attorney for intentionally disclosing to the court settlement offers made in mediation proceeding); *Cohen v. Empire Blue Cross & Blue Shield,* 178 F.R.D. 385 (E.D.N.Y.1998) (sanctioning attorney for violating confidentiality provisions of court-annexed mediation program). Focusing directly on the need for confidentiality between parties to a mediation, another court applied state law to protect the confidentiality of disclosures made during participation in the district court's mediation program. *Doe v. State of Nebraska,* 971 F.Supp. 1305, 1307 (D.Neb.1997) (applying Nebraska law and district court's mediation plan). That court reasoned that:

> [i]f any comments about the dispute made during the negotiation process were later to be construed as admissions, or even to be used to show bias, as permitted in FED. R. EVID. 408, the posturing of the parties in the negotiations could well reduce or eliminate any likelihood of settlement, or even serious negotiation, for the parties would be extremely cautious about advancing a settlement proposal that might be used against them. Thus, they may never get beyond their "positions," even if they both may genuinely want to settle their dispute.

*Id.*

Likewise, several of the district court decisions relied upon by the magistrate judge and discussed above hold that settlement communications between parties should be privileged in one fashion or another, whether the information was communicated in the course of a formal mediation with a neutral or simply in private settlement negotiations between the parties. *See, e.g., Cook,* 132 F.R.D. at 550 (applying underlying policy of Rule 408 to protect documents related to settlement negotiations from discovery); *see also Garstang v. Superior Court,* 39 Cal. App.4th 526, 531–32, 46 Cal.Rptr.2d 84 (2d Dist.1995) (settlement negotiations protected under California's constitutional right of privacy even though parties had not executed written confidentiality agreement required to invoke California's mediation privilege); *Butta–Brinkman v. FCA Int'l, Ltd.,* 164 F.R.D. 475, 476–77 (N.D.Ill.1995) (holding defendant not required to turn over confidential settlement agreements reached in other sexual harassment cases in absence of showing plaintiff will be unable to obtain the relevant information through other discovery); *but see In re March 1994 Special Grand Jury,* 897 F.Supp. 1170, 1172 (S.D.Ind.1995) (invoking comity between state and federal government but refusing to apply state law mediation privilege where information sought did not relate to confidentiality of settlement negotiations); *Carman v. McDonnell Douglas*

*Corp.,* 114 F.3d 790, 793–94 (8th Cir.1997) (applying Rule 501 and refusing to adopt "ombudsman's privilege" in part because employee perception of ombudsman as company investigator is more likely to prevent employee from speaking openly than fact that information imparted is not privileged).

In *Cook,* the court denied a motion to compel production of material disclosed in settlement negotiations between a terminated employee and his employer where the plaintiffs claimed the terminated employee had sexually harassed them. *Cook,* 132 F.R.D. at 550. Although the *Cook* court did not specifically consider confidentiality in the context of mediation, in effect, that court suggested that the intensity of the need for confidentiality supports a broad, blanket privilege extending not only to all alternative dispute resolution proceedings but to all settlement negotiations regardless of their context.

Taking the foregoing authorities en masse, the majority of courts to consider the issue appear to have concluded that the need for confidentiality and trust between participants in a mediation proceeding is sufficiently imperative to necessitate the creation of some form of privilege. This conclusion takes on added significance when considered in conjunction with the fact that many federal district courts rely on the success of ADR proceedings to minimize the size of their dockets.

Many jurisdictions make settlement proceedings, including mediation, a mandatory step in the litigation process. For example, in the Central District of California, Local Rule 23 requires the parties in every civil case to participate in one of the approved settlement procedures. Local Rule 23.2. The Central District specifically permits parties to select a non-judicial dispute resolution proceeding as a settlement procedure and requires each party to submit to the settlement officer a confidential letter that includes a written statement of the case and the party's settlement position. Local Rule 23.5.3, 23.6.1. Most tellingly, the Central District's Local Rule provides:

> [a]ll settlement proceedings shall be confidential. No part of a settlement proceeding shall be reported, or otherwise recorded, without the consent of the parties, except for any memorialization of a settlement and the Clerk's minutes of the proceedings.

Local Rule 23.9. In short, this Court's Local Rules inform parties that information disclosed in whichever settlement proceeding they select will remain confidential. In the absence of a federal mediation privilege, that assurance of confidentiality does little, in the face of third-party discovery, to protect those parties choosing mediation.[7]

Like this District's Local Rules, the proposed Alternative Dispute Resolution Act of 1998 (the "ADR Bill")[8] now pending in the United States Senate Committee on the Judiciary would mandate that each district court establish an ADR system requiring civil litigants to participate in an ADR process. H.R. 3528, 105th Cong. (1998). Mediation is specifically included as one of the acceptable ADR methods. *Id.* With respect to confidentiality, the ADR Bill would amend Title 28 as follows:

> Until such time as rules are adopted under chapter 131 of this title providing for the confidentiality of alternative dispute resolution processes under this chapter, each district court shall, by local rule adopted under section 2071(b), provide for the confidentiality of the alternative dispute resolution processes and to (sic) prohibit disclosure of confidential dispute resolution communications.

---

7. Even if we interpret this Court's Local Rules expansively and read the confidentiality provision as providing protection from compelled disclosure in later federal court proceedings, in the absence of a common law mediation privilege, an anomalous situation arises in which mediation ordered by a federal court is confidential while the confidentiality of a mediation conducted at the direction of a state court or on the parties' own initiative may be invaded under the Federal Rules of Civil Procedure.

8. The Alternative Dispute Resolution Act of 1998 passed in the House of Representatives on April 21, 1998 by a yea-nay vote of 405 to 2 and was received by the Senate and submitted to the Senate Committee on the Judiciary on April 22, 1998.

*Id.* Whether or not the ADR Bill is passed into law, the proposal provides additional evidence of the important federal and public interest in protecting confidential communications in court-ordered mediation.[9]

Passage of the ADR Bill, however, would not establish a separate basis for protecting information revealed in mediation from compulsory disclosure. The federal common law is inapplicable when Congress enacts a law governing a particular privilege. FED. R. EVID. 501. Nonetheless, the ADR Act would provide only a general mandate to establish the confidentiality of court-ordered mediation proceedings. Without explicitly defining that confidentiality in terms of privilege, mediation participants will not be protected from third-party discovery of information disclosed to the opposing party in the course of mediation proceedings.

The proliferation of federal district court rules purporting to protect the confidentiality of mediation and the ADR Bill now pending before the United States Senate indicate a commitment to encouraging confidential mediation as an alternative means of resolving disputes that would otherwise result in protracted litigation. Academic authors differ on the necessity of creating a mediation privilege, but most federal courts considering the issue have protected confidential settlement negotiations and mediation proceedings, either by relying on state law or by applying the confidentiality provisions of federal court ADR programs. Having carefully reviewed the foregoing authority, the Court concludes that the proposed blanket mediation privilege is rooted in the imperative need for confidence and trust among participants.

### b. Public Ends

A new privilege must serve a public good sufficiently important to justify creating an exception to the "general rule disfavoring testimonial privileges." *Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923. The attorney-client privilege encourages observance of the law and facili-

tates the maintenance of an effective adversarial system of justice; the spousal privilege protects the public interest in marital harmony; the doctor-patient and psychotherapist-patient privileges serve the public interest in providing appropriate physical and mental health care. *Id.* at 11, 116 S.Ct. 1923. The proposed blanket mediation privilege would serve public ends by encouraging prompt, consensual resolution of disputes, minimizing the social and individual costs of litigation, and markedly reducing the size of state and federal court dockets.

Articulating a normative distinction between privilege rules that protect relationships and privilege rules that protect desirable activities, one academic has suggested that "what is truly at stake with a mediator's privilege is the promotion of the process of mediation rather than the protection of the relationship between mediator and party." Structural Il(logic), 105 HARV. L. REV. at 1356. The author suggests that because the value of a mediation privilege is its ability to promote dispute resolution rather than its ability to foster ongoing interpersonal relationships, the need for confidentiality in mediation is of a lesser order. *Id.* at 1357. Consequently, the author contends that statements made in conjunction with a mediation, whether divulged exclusively to the mediator or to the opposing party, should be accorded, at most, only a limited "activity" privilege. *Id.*

The fallacy of this argument is in its formalistic adherence to a model that posits first and second-order public interests and then concludes that only first-order, relational interests provide a sufficiently imperative need for confidentiality to justify the creation of a privilege. Although the author suggests that privileges such as the attorney-client privilege provide a social good by promoting important relationships, the Supreme Court has indicated that the public interest served by the attorney-client privilege is the benefit

---

9. The Ninth Circuit noted in *Macaluso* that because participation in FMCS mediation is voluntary, it is fair to charge the participants with acceptance of restrictions on use of information disclosed in mediation proceedings. *Macaluso,* 618 F.2d at 56. Where mediation is mandated,

however, the argument for protecting confidential communications may be even stronger because participants are often assured that all discussions and documents related to the proceeding will be protected from forced disclosure.

to the administration of justice. *See Jaffee,* 518 U.S. at 11, 116 S.Ct. 1923. Furthermore, if the purpose of a mediation privilege is to foster forthright communication between parties to a dispute, rather than to protect only those communications made in private sessions with the mediator, a mediation privilege would fall squarely within the "relational" privileges the Harvard author would protect. Consequently, the level of protection afforded depends largely upon the way in which the relationship is characterized. For example, where disputants have ongoing relationships, consensual dispute resolution serves the public good by fostering conciliatory relationships between employees and employers and between contracting parties in the business world. Whether a blanket mediation privilege is characterized as a relational privilege or as an activity privilege under the author's rubric, it serves important public ends by encouraging open communication in mediation which ultimately leads to better relationships between the parties and to voluntary settlement of cases pending in state and federal courts.

In an early, broad-based critique of the ADR movement, Professor Owen Fiss argues against rules that promote settlement, contending that

> settlement is a capitulation to the conditions of mass society and should be neither encouraged nor praised.... [W]hen the parties settle, society gets less than what appears, and for a price it does not know it is paying. Parties might settle while leaving justice undone. The settlement of a school [desegregation] suit might secure the peace, but not racial equality. Although the parties are prepared to live under the terms they bargained for, and although such peaceful coexistence may be a necessary precondition of justice, and itself a state of affairs to be valued, it is not justice itself. To settle for something means to accept something less than ideal.

Owen Fiss, "Against Settlement," 93 YALE L.J. 1073, 1075–76 (1984). Similarly, Aseem Mehta, writing on confidential mediation of environmental disputes, suggests that confidential settlement of such disputes sometimes masks the true cost to society, allowing polluters to settle without alerting non-parties who will be affected by the clean-up plan, shielding producers of harmful products from public scrutiny, and allowing repeat offenders to avoid the creation of adverse precedent. Note, "Resolving Environmental Disputes in the Hush–Hush World of Mediation: A Guideline for Confidentiality," 10 Geo. J. Legal Ethics 521, 522–23 (1997) (arguing blanket privilege for mediation should not apply in context of environmental and public health disputes, particularly where government agencies are involved because just results require open governmental decision-making process).

While this critique has merit and, in an ideal world, we might prefer to allocate all necessary resources to public adjudication of civil disputes, we live in a world of ever-expanding court dockets and limited judicial resources. A privilege that promotes conciliatory dispute resolution and alleviates the press of cases on the formal judicial system also allows the courts to devote those limited resources to fairly adjudicating those cases that do result in protracted litigation. Rather than the hasty judgments born of overcrowded dockets, the courts are able to provide more carefully considered decisions in matters of sufficient public concern that the parties submit their disputes to a court of law, having found it too difficult to reach a mutually agreeable settlement.

Idealism aside, a mediation privilege would serve important public ends by promoting conciliatory relationships among parties to a dispute, by reducing litigation costs and by decreasing the size of state and federal court dockets, thereby increasing the quality of justice in those cases that do not settle voluntarily.

#### c. Evidentiary Detriment

In assessing the necessity of adopting a new privilege, the courts must consider whether "the likely evidentiary benefit that would result from the denial of the privilege is modest." *Jaffee,* 518 U.S. at 11–12, 116 S.Ct. 1923. In *Jaffee,* the Supreme Court reasoned that in the absence of psychotherapist-patient privilege, "much of the desirable evidence to which litigants ... seek access—

for example, admissions against interest by a party—is unlikely to come into being. This unspoken 'evidence' will therefore serve no greater truth-seeking function than if it had been spoken and privileged." *Id.* at 12, 116 S.Ct. 1923. The same rationale applies with respect to party admissions in mediation proceedings.

Where, as here, an employer is sued by one employee claiming wrongful termination based on false allegations of sexual harassment and by another employee asserting a claim for sexual harassment perpetrated by the other employee, a blanket mediation privilege might permit an unscrupulous employer to garner the benefit of the two employees' opposing positions. In open mediation proceedings, the employer would be forced to strike a balance between the two parties positions rather than taking one employee's side in the first case and then shifting to the other side when defending against charges by the second employee. Despite the potential moral implications of fostering such duplicity, however, there is very little *evidentiary* benefit to be gained by refusing to recognize a mediation privilege.

First, evidence disclosed in mediation may be obtained directly from the parties to the mediation by using normal discovery channels. For example, a person's admission in mediation proceedings may, at least theoretically, be elicited in response to a request for admission or to questions in a deposition or in written interrogatories. In addition, to the extent a party takes advantage of the opportunity to use the cloak of confidentiality to take inconsistent positions in related litigation, evidence of that inconsistent position only comes into being as a result of the party's willingness to attend mediation. Absent a privilege protecting the confidentiality of mediation, the inconsistent position would presumably never come to light.

Although the Court need not, and indeed may not, address the outer limits of a federal mediation privilege, it seems appropriate to note one potential limitation here. A federal mediation privilege may be attenuated of necessity in criminal or quasi-criminal cases where the defendant's constitutional rights are at stake. In a recent decision, a Califor-

nia appellate court discussed the scope of acceptable evidentiary detriment created by the mediation privilege set forth in CAL. EVID. CODE § 1119. *See Rinaker v. Superior Court of San Joaquin County,* 62 Cal. App.4th 155, 74 Cal.Rptr.2d 464 (3d Dist. 1998). In the context of a juvenile delinquency proceeding, the *Rinaker* court found that

> neither the witness nor the mediator had a reasonable expectation of privacy in inconsistent statements made by the witness during confidential mediation because it has long been established that, when balanced against the competing goals of preventing perjury and preserving the integrity of the truth-seeking process of a juvenile delinquency proceeding, the interest in promoting settlements (in this case through confidential mediation of a civil harassment action against the minors) must yield to the minors' constitutional right to effective impeachment.

*Id.* at 161, 74 Cal.Rptr.2d 464.

Despite the potential need to limit a federal mediation privilege in certain types of cases, the matter before the Court is directly in line with the Supreme Court's conclusion in *Jaffee* that a new federal privilege results in little evidentiary detriment where the evidence lost would simply never come into being if the privilege did not exist. In fact, this rationale applies even more strongly in the context of mediation proceedings than in a psychotherapeutic relationship because mediation is part of an overall litigation strategy while psychotherapy is a response to health care concerns. The decision to seek out a therapist is often made without considering the potential impact on pending litigation. By contrast, anyone who attends a mediation, or decides not to use mediation to attempt to resolve a dispute, will consider the effect of disclosures on the pending or potential litigation.

#### d.  Mediation Privilege in the 50 States

In assessing a proposed privilege, a federal court should look to a consistent body of state legislative and judicial decisions adopting such a privilege as an important indicator of both reason and experience. *Jaffee,* 518

U.S. at 12–13, 116 S.Ct. 1923. Put simply, "the policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one." *Id.* Practically speaking, the confidential status accorded to mediation proceedings by the states will be of limited value if the federal courts decline to adopt a federal mediation privilege. *See id.* at 13, 116 S.Ct. 1923:

> Several years ago, one district court addressed the propriety of adopting a federal privilege protecting mediators from being compelled to testify. *See Smith v. Smith,* 154 F.R.D. 661, 670–71 (N.D.Tex.1994) (affirming magistrate judge's decision quashing subpoena served on court-appointed mediator). Because the parties in *Smith* had assumed that state privilege laws applied, that court ultimately declined to resolve the issue. *Id.* Nonetheless, the *Smith* court—considering the somewhat different question raised there of whether a mediator should have protected status—commented at length on the importance of confidentiality to the mediation process. The court noted that "confidentiality appears to be widely accepted in state law as a desirable component of the mediation process[.]" *Id.* at 671. At the same time, however, the *Smith* court suggested that the lack of uniformity and uneven protection of mediation in the states indicates "the absence of consensus concerning the scope of the right of confidentiality." *Id.* at 674 (quoting Young & Ross, § III(B) at 575).

> [A]t a time when state-law support for confidentiality in mediation is apparently increasing, the protections accorded are still characterized as uneven and lacking in uniformity.... The unsettled state of the law reflects disagreement among judges and legislators on the weight of competing interests[.]

*Id.* Although the *Smith* court reached no conclusion with respect to the propriety of adopting a mediator privilege, that court's reasoning suggests the federal courts should attempt to strike a balance or refrain from adopting a privilege when the states are in disagreement about the proper scope of the privilege.

At the forefront of the inquiry, however, is the fact that every state in the Union, with the exception of Delaware, has adopted a mediation privilege of one type or another. Pamela A. Kentra, "Hear No Evil, See No Evil, Speak No Evil: The Intolerable Conflict for Attorney–Mediators between the Duty to Maintain Mediation Confidentiality and the Duty to Report Fellow Attorney Misconduct," 1997 B.Y.U.L. REV. 715, Appendix A (collecting statutes) [hereinafter Here No Evil]. The District of Columbia's court rules on dispute resolution also provide that the mediation process is confidential. *Id.* at 761. While some states provide only limited protection, a majority of the states go beyond protecting communications in private sessions with the mediator, requiring that the entire process be confidential. *Id.* A number of states provide explicitly that information disclosed in mediation proceedings is not subject to discovery. *See, e.g.,* CAL. EVID. CODE § 1119 (admissions made pursuant to a mediation are not subject to discovery); N.Y. JUD. LAW ANN. § 849–b (communications in mediation not subject to disclosure in later judicial proceedings); TEX. CIV. PRAC. & REM CODE ANN. § 154.073 (ADR proceedings confidential and privileged from disclosure); WYO STAT. ANN. § 1–43–103 (party to mediation has privilege to prevent disclosure by other participants); WASH. REV. CODE. ANN. § 7.75.050 (all communications privileged).

The fact that the states have not settled on the scope of protection to provide should not prevent the federal courts from determining that in light of reason and experience we should adopt a federal mediation privilege. While the contours of such a federal privilege need to be fleshed out over time, state legislatures and state courts have overwhelmingly chosen to protect confidential communications in mediation proceedings in order to facilitate settlement of disputes through alternative dispute resolution. "Denial of the federal privilege ... would frustrate the purposes of the state legislation that was enacted to foster these confidential communications." *Jaffee,* 518 U.S. at 13, 116 S.Ct. 1923. Accordingly, this Court finds it is appropriate, in light of reason and experience, to adopt a federal mediation privilege applicable

**1180**

to all communications made in conjunction with a formal mediation.

### e. Contours of the Privilege

■ Where courts are required to balance a number of factors to determine whether a privilege should apply to the particular factual scenario presented, the purpose of the privilege is severely undermined.

> [I]f the purpose of the privilege is to be served, the participants in the confidential conversation must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

*Id.* at 18, 116 S.Ct. 1923 (internal marks omitted). Accordingly, in adopting any privilege under Rule 501, the federal courts must attempt to provide a clear rule of protection.

The mediation underlying the instant dispute was a formal mediation with a neutral mediator, not a private settlement discussion between the parties. Accordingly, the mediation privilege adopted today applies only to information disclosed in conjunction with mediation proceedings with a neutral. Any interpretation of Rule 501 must be consistent with Rule 408. To protect settlement communications not related to mediation would invade Rule 408's domain; only Congress is authorized to amend the scope of protection afforded by Rule 408. Consequently, any post-mediation communications are protected only by Rule 408's limitations on admissibility.

On the facts presented here, the Court concludes that communications to the mediator and communications between parties during the mediation are protected. In addition, communications in preparation for and during the course of a mediation with a neutral must be protected. Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation. To protect additional communications, the parties are required to return to mediation. A contrary rule would permit a party to claim the privilege with respect to any settlement negotiations so long as the communications took place following an attempt to mediate the dispute.[10]

■ Based on the foregoing analysis, although Magistrate Judge Woehrle erred as a matter of law by failing to strictly apply Rule 501, the ultimate decision to deny plaintiff's motion to compel is properly sustained. The Court also concludes that Magistrate Judge Woehrle neither erred as matter of law nor made a clearly erroneous factual determination when she concluded that Vasquez did not waive the mediation privilege when the Plans' attorneys disclosed the mediation brief to Saxe without Vasquez' consent. "Waiver is the intentional relinquishment of a *known* right." 11 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW, EQUITY § 178 (9th ed 1990) (citations omitted). Vasquez neither expressly nor impliedly consented to the Plans' disclosure of the mediation brief to Saxe.

Because the Court has not had the benefit of in camera review of the documents at issue, certain documents at issue may fall outside the scope of the mediation privilege adopted today. Accordingly, as set forth in detail below, plaintiff may attempt to compel production of communications that took place between counsel privy to the mediation after the mediation was formally concluded.

## III.

### *Conclusion*

For the foregoing reasons, plaintiff's Objections to the Magistrate Judge's order are

---

10. In light of the requirement that each privilege be adopted or rejected wholesale in order to ensure privileges are applied predictably, the Court found it necessary to consider the validity of adopting a federal mediation privilege in some depth. Nonetheless, this Court is presented with the relatively narrow question raised by the litigants. The Court has not attempted to fully elucidate the appropriate scope of a mediation privilege under the federal common law. For example, the Court does not consider questions of waiver beyond those briefly mentioned below, nor does the Court consider exceptions to the application of a mediation privilege. Whether traditional exceptions such as the crime-fraud exception to the attorney-client privilege are applicable in the context of a mediation privilege must be left for another day.

SUSTAINED with respect to the underlying legal reasoning and **OVERRULED** with respect to the magistrate judge's ultimate decision to deny plaintiff's motion to compel production of the mediation brief and communications between counsel privy to the mediation, at least to the extent that those communications were made in anticipation of or during the course of the mediation. Plaintiff may seek, by renewed motion before the Magistrate Judge within fifteen days of entry of this order, to compel production of any documents relating to communications between Vasquez and the Plans that were not made in conjunction with, or pursuant to, the formal mediation proceeding.

In short, the Court concludes that encouraging mediation by adopting a federal mediation privilege under FED. R. EVID. 501 will provide "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Jaffee*, 518 U.S. at 9, 116 S.Ct. 1923.

**IT IS SO ORDERED.**