## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## JOSEPH MACALUSO, INC., d/b/a Lemon Tree, Respondent.

### No. 77–3748.

United States Court of Appeals, Ninth Circuit.

April 16, 1980.

Eric Moskowitz, Washington, D. C., argued for petitioner; Elliott Moore, NLRB, Washington, D. C., on brief.

Eugene R. Nielson, Lane, Powell, Moss & Miller, Seattle, Wash., Nancy R. Broff, Washington, D. C., for respondent.

Petition to Review a Decision of the National Labor Relations Board.

Before DUNIWAY and WALLACE, Circuit Judges, and JAMESON,* District Judge.

WALLACE, Circuit Judge:

The single issue presented in this National Labor Relations Board (NLRB) enforcement proceeding is whether the NLRB erred in disallowing the testimony of a Federal Mediation and Conciliation Service (FMCS) mediator as to a crucial fact occurring in his presence. The decision and order of the Board are reported at 231 N.L.R.B. 91. We enforce the order.

I.

In early 1976 Retail Store Employees Union Local 1001 (Union) waged a successful campaign to organize the employees of Joseph Macaluso, Inc. (Company) at its four retail stores in Tacoma and Seattle, Washington. The Union was elected the collective bargaining representative of the Company's employees, was certified as such by the NLRB, and the Company and Union commenced negotiating a collective bargaining agreement. Several months of bargaining between Company and Union negotiators failed to produce an agreement, and the parties decided to enlist the assistance of a mediator from the FMCS. Mediator Douglas Hammond consequently attended the three meetings between the Company and Union from which arises the issue before us. To frame that issue, it is necessary first to describe the history of this litigation.

During the spring and summer of 1976 the Company engaged in conduct which led the NLRB to charge it with unfair labor practices. Proceedings were held and the NLRB ruled that the Company had violated section 8(a)(1) of the National Labor Relations Act (NLRA) by threatening pro-union employees, and section 8(a)(3) of the NLRA by discharging an employee for union activity. At this unfair labor practice proceeding the NLRB also found that the Company and Union had finalized a collective bargaining agreement at the three meetings with Hammond, and that the Company had violated NLRA sections 8(a)(5) and (1) by failing to execute the written contract incorporating the final agreement negotiated with the Union. The NLRB ordered the Company to execute the contract and pay back-compensation with interest, and seeks enforcement of that order in this court. In response, the Company contends that the parties have never reached agreement, and certainly did not do so at the meetings with Hammond.

The testimony of the Union before the NLRB directly contradicted that of the Company. The two Union negotiators testified that during the first meeting with Hammond the parties succeeded in reducing to six the number of disputed issues, and that the second meeting began with Company acceptance of a Union proposal resolving

---

* Honorable William J. Jameson, United States District Judge, District of Montana, sitting by designation.

five of those six remaining issues. The Union negotiators further testified that the sixth issue was resolved with the close of the second meeting, and that in response to a Union negotiator's statement "Well, I think that wraps it up," the Company president said, "Yes, I guess it does." The third meeting with Hammond, accordance to the Union, was held only hours before the Company's employees ratified the agreement, was called solely for the purpose of explaining the agreement to the Company accountant who had not attended the first two meetings, and was an amicable discussion involving no negotiation.

The Company testimony did not dispute that the first meeting reduced the number of unsettled issues to six, but its version of the last two meetings contrasts sharply with the Union's account. The Company representatives testified that the second meeting closed without the parties having reached any semblance of an agreement, and that the third meeting was not only inconclusive but stridently divisive. While the Union representatives testified that the third meeting was an amicable explanatory discussion, the Company negotiators both asserted that their refusal to give in to Union demands caused the Union negotiators to burst into anger, threaten lawsuits, and leave the room at the suggestion of Hammond. According to the Company, Hammond was thereafter unable to bring the parties together and the Union negotiators left the third meeting in anger.

In an effort to support its version of the facts, the Company requested that the administrative law judge (ALJ) subpoena Hammond and obtain his testimonial description of the last two bargaining sessions. The subpoena was granted, but was later revoked upon motion of the FMCS. Absent Hammond's tie-breaking testimony, the ALJ decided that the Union witnesses were more credible and ruled that an agreement had been reached. The Company's sole contention in response to this request

for enforcement of the resulting order to execute the contract is that the ALJ and NLRB erred in revoking the subpoena of Hammond, the one person whose testimony could have resolved the factual dispute.[1]

## II.

Revocation of the subpoena was based upon a long-standing policy that mediators, if they are to maintain the appearance of neutrality essential to successful performance of their task, may not testify about the bargaining sessions they attend. Both the NLRB and the FMCS (as amicus curiae) defend that policy before us. We are thus presented with a question of first impression before our court: can the NLRB revoke the subpoena of a mediator capable of providing information crucial to resolution of a factual dispute solely for the purpose of preserving mediator effectiveness?

Statutory authority for NLRB subpoena revocation is found in NLRA section 11(1), 29 U.S.C. § 161(1):

Within five days after the service of a subpena on any person requiring the production of any evidence in his possession or under his control, such person may petition the [NLRB] to revoke, and the [NLRB] shall revoke, such subpena if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena does not describe with sufficient particularity the evidence whose production is required.

We have interpreted this provision broadly, stating:

The statute in question does not state that petitions to revoke subpoenas can only be made on the two grounds therein stated, or that the [ALJ] or [NLRB] may revoke only on those grounds. It does provide that a person served with such a subpoena may petition for revocation of the subpoena and the [NLRB] *shall* revoke it if one of the two specified circum-

1. The Company did not challenge the NLRB's finding of unfair labor practices from the threatening and discharge of employees.

stances exist [sic]. Insofar as the statute is concerned, the [NLRB] may also revoke a subpoena on any other ground which is consonant with the overall powers and duties of the [NLRB] under the [NLRA] considered as a whole.

*General Engineering, Inc. v. NLRB*, 341 F.2d 367, 372–73 (9th Cir. 1965) (emphasis in original). We must determine, therefore, whether preservation of mediator effectiveness by protection of mediator neutrality is a ground for revocation consistent with the power and duties of the NLRB under the NLRA. Stated differently, we must determine whether the reason for revocation is legally sufficient to justify the loss of Hammond's testimony. The NLRB's own regulation authorizing revocation states:

> The administrative law judge or the [NLRB] as the case may be, shall revoke the subpena if in its opinion the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings or the subpena does not describe with sufficient particularity the evidence whose production is required, *or if for any other reason sufficient in law the subpena is otherwise invalid.*

29 C.F.R. § 102.31(b) (1979) (emphasis added).

The NLRB's revocation of Hammond's subpoena conflicts with the fundamental principle of Anglo-American law that the public is entitled to every person's evidence. *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972); *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); 8 Wigmore, Evidence § 2192, at 70 (McNaughton Rev. 1961). According to Dean Wigmore this maxim has existed in civil cases for more than three centuries, and the Sixth Amendment guarantee of compulsory process was created "merely to cure the defect of the common law by giving to parties defendant in criminal cases the common right which was already .   . possessed ·.   .   .   by parties in civil cases .   .   .   ." *Id.* at § 2191, at 68.

The facts before us present a classic illustration of the need for every person's evidence: the trier of fact is faced with directly conflicting testimony from two adverse sources, and a third objective source is capable of presenting evidence that would, in all probability, resolve the dispute by revealing the truth. Under such circumstances, the NLRB's revocation of Hammond's subpoena can be permitted only if denial of his testimony "has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting), *quoted in United States v. Nixon*, 418 U.S. 683, 710 n.18, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). The public interest protected by revocation must be substantial if it is to cause us to "concede that the evidence in question has all the probative value that can be required, and yet exclude it because its admission would injure some other cause more than it would help the cause of truth, and because the avoidance of that injury is considered of more consequence than the possible harm to the cause of truth." 1 Wigmore, Evidence § 11, at 296 (1940). We thus are required to balance two important interests, both critical in their own setting.

We conclude that the public interest in maintaining the perceived and actual impartiality of federal mediators does outweigh the benefits derivable from Hammond's testimony. This public interest was clearly stated by Congress when it created the FMCS:

> It is the policy of the United States that—
>
> (a) sound and stable industrial peace and the advancement of the general welfare, health, and safety of the Nation and of the best interests of employers and employees can most satisfactorily be secured by the settlement of issues between employers and employees through the processes of conference and collective bargaining between employers and the representatives of their employees;
>
> (b) the settlement of issues between employers and employees through collec-

tive bargaining may be advanced by making available full and adequate governmental facilities for conciliation, mediation, and voluntary arbitration to aid and encourage employers and the representatives of their employees to reach and maintain agreements concerning rates of pay, hours, and working conditions, and to make all reasonable efforts to settle their differences by mutual agreement reached through conferences and collective bargaining or by such methods as may be provided for in any applicable agreement for the settlement of disputes

. . . .

29 U.S.C. § 171(a)(b). Since Congress made this declaration, federal mediation has become a substantial contributor to industrial peace in the United States. The FMCS, as amicus curiae, has informed us that it participated in mediation of 23,450 labor disputes in fiscal year 1977, with approximately 325 federal mediators stationed in 80 field offices around the country. Any activity that would significantly decrease the effectiveness of this mediation service could threaten the industrial stability of the nation. The importance of Hammond's testimony in this case is not so great as to justify such a threat. Moreover, the loss of that testimony did not cripple the fact-finding process. The ALJ resolved the dispute by making a credibility determination, a function routinely entrusted to triers of fact throughout our judicial system.

The FMCS has promulgated regulations which explain why the very appearance of impartiality is essential to the effectiveness of labor mediation.

Public policy and the successful effectuation of the Federal Mediation and Conciliation Service's mission require that commissioners and employees maintain a reputation for impartiality and integrity. Labor and management or other interested parties participating in mediation efforts must have the assurance and confidence that information disclosed to commissioners and other employees of the Service will not subsequently be divulged, voluntarily or because of compulsion, un-

less authorized by the Director of the Service.

.     .     .     .     .

No officer, employee, or other person officially connected in any capacity with the Service, currently or formerly shall, in response to a subpoena, subpoena duces tecum, or other judicial or administrative order, produce any material contained in the files of the Service, disclose any information acquired as part of the performance of his official duties or because of his official status, or testify on behalf of any party to any matter pending in any judicial, arbitral or administrative proceeding, without the prior approval of the Director.

29 C.F.R. § 1401.2(a), (b) (1979). This need for the appearance of impartiality, and the potential for loss of that appearance through any degree of mediator testimony, was well expressed by the NLRB in the decision relied upon by the ALJ when revoking Hammond's subpoena:

However useful the testimony of a conciliator might be to the [NLRB] in any given case, we can appreciate the strong considerations of public policy underlying the regulation [denying conciliator testimony] and the refusal to make exceptions to it, because of the unique position which the conciliators occupy. To execute successfully their function of assisting in the settlement of labor disputes, the conciliators must maintain a reputation for impartiality, and the parties to conciliation conferences must feel free to talk without any fear that the conciliator may subsequently make disclosures as a witness in some other proceeding, to the possible disadvantage of a party to the conference. If conciliators were permitted or required to testify about their activities, or if the production of notes or reports of their activities could be required, not even the strictest adherence to purely factual matters would prevent the evidence from favoring or seeming to favor one side or the other. The inevitable result would be that the usefulness of the [FMCS] in the settlement of future

disputes would be seriously impaired, if not destroyed. The resultant injury to the public interest would clearly outweigh the benefit to be derived from making their testimony available in particular cases.

*Tomlinson of High Point, Inc.,* 74 N.L.R.B. 681, 688 (1947). We agree.

During oral argument the suggestion was made that we permit the mediator to testify, but limit his testimony to "objective facts" as suggested by *International Association of Machinists and Aerospace Workers v. National Mediation Board,* 425 F.2d 527, 540 (D.C.Cir.1970). We do not believe, however, that such a limitation would dispel the perception of partiality created by mediator testimony. In addition to the line-drawing problem of attempting to define what is and is not an "objective fact," a recitation of even the most objective type of facts would impair perceived neutrality, "for the party standing condemned by the thrust of such a statement would or at least might conclude that the [FMCS] was being unfair." *Id.* at 539. "[N]ot even the strictest adherence to purely factual matters would prevent the evidence from favoring or seeming to favor one side or the other." *Tomlinson of High Point, Inc., supra,* 74 N.L.R.B. at 688.

We conclude, therefore, that the complete exclusion of mediator testimony is necessary to the preservation of an effective system of labor mediation, and that labor mediation is essential to continued industrial stability, a public interest sufficiently great to outweigh the interest in obtaining every person's evidence.[2] No party is required to use the FMCS; once having voluntarily agreed to do so, however, that party must be charged with acceptance of the restriction on the subsequent testimonial use of the mediator. We thus an-

swer the question presented by this case in the affirmative: the NLRB can revoke the subpoena of a mediator capable of providing information crucial to resolution of a factual dispute solely for the purpose of preserving mediator effectiveness.[3] Such revocation is consonant with the overall powers and duties of the NLRB, a body created to implement the NLRA goals of "promot[ing] the flow of commerce by removing certain recognized sources of industrial strife and unrest" and "encouraging practices fundamental to the friendly adjustment of industrial disputes . . . ." 29 U.S.C. § 151.

THE ORDER OF THE BOARD IS ENFORCED.

---

2. We need not reach the question whether a different result would occur if the FMCS Director granted authority for the mediator to testify pursuant to 29 C.F.R. § 1401.2(b) (1979).

3. The Company argued that revocation of Hammond's subpoena was improper because communications made to him during the course

of the bargaining sessions were necessarily made in the presence of the opposing party and were not, therefore, confidential. Such a contention misapprehends the purpose of excluding mediator testimony which is to avoid a breach of impartiality, not a breach of confidentiality.