State of CALIFORNIA, ex rel.
Bill LOCKYER, Plaintiff,

v.

SAFEWAY, INC., dba Vons, Albertson's,
Inc., Ralphs Grocery Company, a division of the Kroger Company, Food 4
Less, a division of the Kroger Company, and Does 1 through 100, inclusive,
Defendants.

No. CV 04–0687–GHK.

United States District Court,
C.D. California.

Jan. 28, 2005.

Karl Olson and Erica L. Craven, Levy, Ram & Olson LLP, San Francisco, CA, Karlene Goller, Deputy General Counsel, Los Angeles Times, Los Angeles, CA, for Intervenor, the Los Angeles Times.

Jeffrey A. LeVee and Amy Stathos, Jones Day, Los Angeles, CA, Phillip A. Proger, Jones Day, Washington, DC, for Defendant, Albertson's Inc.

J. Thomas Rosch and Peter Huston, Latham & Watkins LLP, San Francisco, Daniel A. Beck, Latham & Watkins LLP, Los Angeles, CA, for Defendant, The Vons Companies, Inc.

Robert B. Pringle and Peter Burns, Thelen Reid & Preist LLP, San Francisco, CA, for Defendant, Ralphs Grocery Company.

## MEMORANDUM AND ORDER RE: 1) PLAINTIFF'S MOTION TO UNSEAL COURT RECORDS, AND 2) LOS ANGELES TIMES' MOTION TO UNSEAL COURT RECORDS

KING, District Judge.

### I

### INTRODUCTION

This matter is before us on the motions of Plaintiff, the State of California ("State"), and Intervenor,[1] the *Los Angeles Times* ("*LAT*"), to unseal court records relating to a pending motion for summary judgment.[2] We have fully considered the parties' briefing on these motions and their oral argument. By this order, we now decide these motions.

Bill Lockyer, Richard M. Frank, Thomas Greene, Kathleen Foote, Barbara, M. Motz and Olivia W. Karlin, Office of the Attorney General, Los Angeles, CA, for Plaintiff, the State of California.

---

1. *LAT* also moved to intervene in order to file its motion to unseal. At the hearing on January 24, 2005, we granted *LAT*'s motion to intervene.

2. We do not reach the merits of that summary judgment motion in this order.

## II

## BACKGROUND

This case arises from the grocery store labor strike that took place in Southern California from late 2003 to early 2004. The strike involved three major supermarket chains in the region and persisted for 141 days. The labor dispute was a ubiquitous feature of the news while it was ongoing, and it purportedly disrupted the daily routines of millions of Southern California residents because it involved hundreds of stores.

On February 2, 2004, Attorney General Bill Lockyer, on behalf of the State, filed a complaint alleging that Defendants Safeway, Inc., d.b.a. Vons, Albertson's, Inc., Ralphs Grocery Company, and Food 4 Less Food Company (collectively, "the Employers" or "the Supermarkets") violated section 1 of the Sherman Act, 15 U.S.C. § 1, by engaging in unlawful combination and conspiracy in restraint of interstate trade and commerce. The State claimed that in anticipation of the impending labor dispute in Southern California, the Supermarkets entered into a Mutual Strike Assistance Agreement ("MSAA"), whereby they agreed to share certain revenue in the event of a strike. Defendants answered the complaint, asserting several affirmative defenses. For present purposes, the only defense that is relevant is Defendants' assertion that the MSAA is outside the scope of the Sherman Act because, as an agreement to protect the Supermarkets' ability to conduct multi-employer collective bargaining, it falls under the non-statutory labor exemption to the antitrust laws.

With the parties' agreement, we bifurcated the case in order to permit Defendants to litigate first whether the MSAA is immunized from antitrust attack by the non-statutory labor exemption. During the course of discovery on this initial issue, the State and the Supermarkets entered into a stipulation and protective order pursuant to Fed.R.Civ.P. 26(c) whereby they agreed that they would have the right to designate documents as "confidential" prior to producing them during discovery. Confidential documents were defined as those relating to (1) cost and pricing information and pricing strategies, and (2) collective bargaining negotiations that took place between the Employers and certain United Food and Commercial Workers ("UFCW") union organizations. After the protective order was approved by Magistrate Judge Suzanne Segal, the Supermarkets produced to the State the MSAA, as well as drafts of the agreement and other documents relating to it. All of these discovery documents were labeled "confidential," thereby protecting them from disclosure to third parties.

On August 27, 2004, Defendants filed their motion for summary judgment on this threshold issue and attached exhibits that reveal the details of their revenue sharing plan. Defendants sought and obtained the court's order to file the summary judgment motion and related documents under seal. One set of exhibits was filed in the public record, and a separate set was filed under seal. Defendants prepared a redacted version of the joint summary judgment briefing to be filed in the public record. This redacted version omitted all specific references to provisions of the MSAA, as well as large sections of Plaintiff's arguments. Defendants' aggressive redaction went so far as to eliminate even certain citations to cases in the table of authorities, including a reference to a seminal United States Supreme Court case.

The State then challenged the confidential designation of the MSAA before Judge Segal, who upheld the designation and denied the State's motion to re-designate the MSAA as non-confidential. She held that

the protective order had been entered for "good cause." The only matter before her was whether raw discovery should be kept confidential. Although the State also moved to unseal the full briefing on the summary judgment motion, as well as the documents submitted therewith, Judge Segal concluded that matter was not properly before her and declined to rule on it.

On November 22, 2004, the State filed the instant motion to unseal the court records before us, and a day later, on November 23, 2004, *LAT* moved to intervene in order to file its own motion to unseal the court records. The Attorney General, acting on behalf of the People of California, asserts that the public's interest in free and open access to the court's records warrants disclosure. *LAT* asserts a separate but related public interest in unsealing the same records on the basis of its standing as a press intervenor seeking to report fully and accurately on a matter of significant public concern.

Both the State and *LAT* contend that when Defendants filed their summary judgment motion, and thereby put these documents into the court records, a strong presumption favoring public access to these documents arose. Their motions to unseal do not seek to disclose raw discovery; rather, they seek only to unseal the summary judgment briefing and related exhibits.

The motions now before us assert the right of public access to court records under both the common law and First Amendment. Defendants contend that the national labor policy interest in promoting collective bargaining outweighs any interests in disclosure because Defendants' ability to conduct collective bargaining in future labor disputes would be severely harmed if these records are unsealed.

## III

### DISCUSSION

#### A. *Common Law Right of Access*

■ The State and *LAT* contend that there are two separate public rights of access at issue in these motions: a right under the First Amendment and an independent right under common law. Federal courts generally should avoid deciding constitutional issues if a case can be resolved on other grounds. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). For this reason, we begin our inquiry with the common law right of access to determine if this doctrine can resolve whether the court's records should be unsealed and thereby eliminate the need for us to reach the constitutional issue. *See Hagestad v. Tragesser*, 49 F.3d 1430, 1434 n. 6 (9th Cir.1995).

■ The public's common law right of access in civil cases "creates a strong presumption in favor of access . . . ." *San Jose Mercury News, Inc. v. United States District Court*, 187 F.3d 1096, 1102 (9th Cir. 1999); *see also Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir.2003) ("In this circuit, we start with a strong presumption in favor of access to court records."). Overcoming this presumption requires a showing of compelling reasons for denying access. *Foltz*, 331 F.3d at 1135; *San Jose Mercury News*, 187 F.3d at 1102. If we find that such reasons have been established, we must "articulate the factual basis for [the] ruling, without relying on hypothesis or conjecture." *Foltz*, 331 F.3d at 1135 (quoting *Hagestad*, 49 F.3d at 1434).[3]

---

**3.** Though the Ninth Circuit has not yet directly addressed the public's right of access to

judicial records in a case involving antitrust allegations and purported confidential labor

Defendants argue that the presumption of public access in this case is rebutted by the existence of a stipulated protective order. They also rely on Judge Segal's findings that there was "good cause" for the protective order and the MSAA fell within the scope of that order. However, the Ninth Circuit has drawn a sharp distinction between the impact of protective orders on the public's right of access to raw discovery and non-dispositive motions, and the impact of such orders on the public's right of access to dispositive motions, such as a summary judgment motion. *See id.* at 1135. The rule in this circuit is that the presumption of access to court records is rebutted by the existence of a protective order only in the case of *non-dispositive* motions. *Id.* at 1135–36 (discussing *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir.2002)). However, the Ninth Circuit has expressly distinguished summary judgment motions from such non-dispositive motions because "summary judgment adjudicates substantive rights and serves as a substitute for trial." *Id.* at 1135 (quoting *Rushford v. The New Yorker Magazine*, 846 F.2d 249, 252 (4th Cir. 1988)). Accordingly, a higher showing is required to deny the public access to the court's summary judgment records than the mere "good cause" standard at issue during discovery. "[T]he presumption of access is *not* rebutted where, as here, documents subject to a protective order are filed under seal as attachments to a dispositive motion." *Id.* at 1136 (emphasis added).

Given the presumption of access, which is not rebutted by the existence of a pro-

tective order in this case, the Employers bear the burden of establishing "compelling reasons" justifying the sealing of the court's summary judgment record. Since we may not base factual findings on hypothesis or conjecture, the Employers must make a specific factual showing in support of their attempt to resist public access to the summary judgment documents.

We determine whether the common law right of access has been overcome through a showing of compelling reasons by balancing "all relevant factors." *Id.* at 1135. Although the circuit has not yet offered clear guidance on what factors should be deemed relevant, based on a close reading of the case law, we discern the following factors to be relevant in this case: (1) the public's interest in understanding the judicial process; (2) whether disclosure of the material at issue could result in improper use (such as to incite scandal, libel a party or enable infringement of a party's trade secrets); (3) the interests of the parties, and the balance of equities; (4) the national labor policy; and (5) the duty of the courts to balance all of these competing interests and to inform the public of the basis for its decision. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 602–04, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Hagestad*, 49 F.3d at 1434; *Valley Broad. Co. v. United States District Court*, 798 F.2d 1289, 1294 (9th Cir.1986).

### B. *Defendants' Showing*

We begin by evaluating the evidentiary record establishing Defendants' interests

---

negotiating strategies, the Third Circuit analyzed a motion to unseal court records in an antitrust case using the same "compelling reasons" standard set forth by the Ninth Circuit in *Foltz*. *See Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir.1994). We conclude that there is no basis to infer that the Ninth

Circuit would depart from the "compelling reasons" standard required by *Foltz* in a matter such as this. Because the "compelling reasons" standard requires us to balance all relevant factors, it adequately accounts for the antitrust and labor policies implicated in this case.

in keeping the court records confidential, because Defendants bear the burden of rebutting the presumption of public access. Defendants offer two pieces of evidence to establish their interests and to show that they would suffer severe harm through disclosure: the declarations of Messrs. Cox and Bohn (filed as LeVee Decl., Ex. G & H), which describe the harms that the Supermarkets would suffer if the MSAA were to be revealed.[4] Defendants offer no evidence showing that harm would result from disclosure of any document contained in the voluminous summary judgment record, other than the MSAA.[5] At oral argument, Defendants' counsel represented that the harm that would result from disclosure of these other documents in the summary judgment record springs from those documents' relation to the MSAA. In other words, Defendants' position is that these other exhibits should be confidential because they relate to, or shed light upon, the MSAA. Since Defendants have offered no independent reasons for keeping these other exhibits confidential, public access to these documents should be restricted only to the extent that we determine that the MSAA, or any provisions thereof, should be confidential.

### 1. *Showing of Future Harm Resulting from Disclosure of the MSAA*

Mr. Cox, who is employed as Group Vice President for Labor Relations by Safeway (the parent company of Vons), avers that Vons entered into the MSAA to combat the unions' anticipated "whipsaw" tactics, whereby the unions would attempt to divide the Employers by striking and picketing only one Employer to undermine its ability to remain united with the others. Whipsawing, which typically involves selec-

tive picketing of some, but not all, of the Employers, is purportedly a tactic used by unions to undermine an individual Employer's will to maintain solidarity with the other members of the multi-employer collective bargaining unit by driving a wedge between the Employers' economic interests. Mr. Cox explains that the Supermarkets entered into the MSAA to counteract the pressure of such whipsawing. (LeVee Decl., Ex. G, attaching Cox Decl. at ¶ 5). The agreement provided that "the Employers would share certain revenues, according to a pre-established formula, so that one or more of the Employers' [*sic*] [would] not experience a disproportionate impact from the Unions' whipsaw tactics." (*Id.*)

█ It is, of course, undisputed that the 2003–2004 grocery store strike, for which this MSAA was created, has been over for nearly a year. There is no pending labor dispute involving the particular unions or stores covered by the MSAA at issue in this case. Thus, for Defendants to establish compelling reasons justifying the continued confidentiality of this agreement, they must, at the very least, make a specific factual showing of this MSAA's continuing usefulness to them in labor negotiations in the future. They have failed to do so.

According to Mr. Cox, Safeway and the other Employers have utilized such agreements in the past at other locations, and they "are *considering* entering into *similar* such agreements for pending and future negotiations outside of Southern California." (*Id.* at ¶ 6) (emphasis added). He does not identify what provisions of the

---

4. The LeVee Declaration was not filed under seal. The declarations of Messrs. Cox and Bohn are thus now a matter of public record.

5. In addition to the MSAA, the summary judgment record contains many other documents

filed under seal, including full deposition transcripts and deposition exhibits of key employees of the Supermarkets who are knowledgeable about the MSAA, as well as several declarations of those same employees.

MSAA would be adopted, or to what extent these anticipated other agreements would be "similar." He also does not identify where or when such "similar" agreements might be used. Mr. Bohn, who serves as Albertson's Director of Labor Relations in Southern California, also filed a declaration, not under seal, averring that the Employers "have previously entered into MSAAs in other parts of the country, and are considering entering into similar agreements in the future." (LeVee Decl., Ex. H, attaching Bohn Decl., at ¶ 8). Like Mr. Cox, he provides no additional detail regarding this matter.

■ Although we are sensitive to Defendants' need to divulge as little as possible about their strategy in pending or future labor disputes, we are also bound by the Ninth Circuit's requirement that we may base a finding of compelling reasons justifying the sealing of court records only "on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *Hagestad*, 49 F.3d at 1434. Statements that Defendants are "considering" using "similar" agreements lack sufficient specificity to establish compelling reasons to limit the public's access to the MSAA. To find that these statements make a showing of harm resulting from disclosure, we would have to speculate that Defendants' "consideration" would someday give rise to a firm decision to use some provision of the MSSA at some point in the future in an unidentified labor dispute, and that whatever provision of the MSAA they decide to use would be so similar in material respects that divulging the terms of the agreement used in the 2003–2004 strike would disclose key strategies. It would also require us to assume that the terms of the MSAA would not be varied significantly in such hypothetical future negotiations. Though we recognize the possibility that such a situation might arise, it requires us to make an impermissibly long chain of inferences based on

conjecture that is otherwise unsupported by the facts in the record. We decline to engage in such speculation.

At oral argument, Defendants intimated that we should modify settled circuit law to accommodate the national labor policy favoring confidentiality of negotiating strategies in collective bargaining. While we recognize that any legitimate and articulable reason for confidentiality rooted in national labor policy must be adequately weighed and balanced in our analysis, we decline Defendants' invitation to lessen-or reverse-their burden in opposing public access to these documents merely because labor issues are involved. On this record, we are compelled to conclude that Defendants have not made a sufficient showing of specific and cognizable harm to future collective bargaining negotiations resulting from disclosure of the MSAA they used in the strike in 2003–2004.

### 2. *Specific Provisions Identified by Mr. Cox*

Even assuming *arguendo* that Defendants made a sufficient showing of a general need for continuing confidentiality (which, as discussed above, they did not do), we must examine the showing for each particular provision of the MSAA to determine, after balancing of all relevant factors, which provisions should remain confidential, and which should be disclosed. As Defendants acknowledged in oral argument, the only evidence of specific harm purportedly arising from disclosure of particular provisions of the MSAA is in paragraph 8 of the declaration of Mr. Cox.

Mr. Cox identifies the following provisions as reflecting the Employers' confidential strategies:

> the requirement that the parties to the agreement lockout employees in the event of a strike (the MOA[s] allow for a lock-out but do not mandate one), the scope and timing of such a lockout, the

timing and formula for revenue sharing, the Employers' designation of a chief negotiator, a process for agreeing to concessions, positions, offers and agreements relative to common issues in the negotiations, the authority of the individual companies to enter into separate agreements, the coordination of communications to employees and the methods of communication to the press.

(LeVee Decl., Ex. G, attaching Cox Decl. at ¶ 8). We consider each of the strategies in turn.

First, as to the MSAA provision requiring a lockout, Defendants conceded at oral argument that Mr. Cox's declaration itself discloses this fact to the public. Even if the filing of Mr. Cox's declaration in the public record had not divulged it, the requirement of the lockout in the MSAA became publicly known as a matter of historical fact because all of the Supermarkets did, in fact, lockout their employees in unison when the first of them was struck.

Second, the terms of the MSAA provision describing the scope and timing of such a lockout is also a matter of public knowledge as a historical fact.

Third, the MSAA provision governing the designation of a chief negotiator became known to the unions during the negotiations. It is also now public by virtue of Mr. Cox's declaration. Moreover, this term is obvious and implicit in the nature of the multi-employer collective bargaining unit. At oral argument, Defendants conceded that this provision is also no longer confidential in light of the historical fact that they actually designated a chief negotiator.

Fourth, Defendants agree that the "process for agreeing to concessions, positions, offers and agreements relative to common negotiations" identified in Mr. Cox's declaration refers to paragraphs 5(A) (second sentence) and 5(J)(ii) of the MSAA. While Defendants' counsel spent a great deal of time at oral argument contending that the second sentence of paragraph 5(A) was very sensitive to his clients, our reading leads us to a contrary conclusion. Counsel could not and did not set forth any reasons, but instead merely offered cryptic responses, essentially asking the Court to guess why its secrecy would matter. We decline to speculate on what unenunciated reasons the Employers may have once had in keeping the second sentence of paragraph 5(A) confidential, or whether those reasons have any continuing force in the future. While paragraph 5(J)(ii) appears to be confidential and is related to bargaining strategy, it also appears to be a fairly obvious mechanism by which employers would have to act as part of a single bargaining unit. Defendants have made no specific, non-speculative showing as to how the unions would benefit from knowledge of this provision. Absent any facts in the record from which we could infer that Defendants would suffer harm from disclosure of this particular provision, we conclude that there are no compelling reasons justifying keeping it under seal.

Fifth, Defendants acknowledge that Cox's reference to the Employers' ability to enter into separate agreements relates to the terms set forth in paragraph 5(J)(iii) of the MSAA. However, the very terms of this provision require the Employers to inform the unions.

Sixth, as for the Employers' methods of communicating with employees during the strike, which relates to the terms set forth in paragraph 5(J)(iv) of the MSAA, Cox's declaration again gives away the entire secret when it states that the agreement provides for "coordination of communications to employees." (LeVee Decl., Ex. G, attaching Cox Decl. at ¶ 8). Though Defendants respond that Cox merely described the provision generally, having reviewed the MSAA, we find that there is

nothing more specific to describe. His language in the declaration reveals this provision in a manner that divests it of confidentiality. As to the Employers' methods for communication with the press in paragraph 5(J)(v), we find that this term is also obvious and has essentially been revealed by Mr. Cox's declaration.

Finally, the crux of the matter seems to be the timing and formula of the revenue sharing provisions, set forth at paragraphs 5(F) and 6 of the MSAA. At oral argument, Defendants conceded that the timing of the revenue sharing was no longer secret. While it was confidential at the time of the strike, it is no longer so. Defendants' statements in the joint report of the parties planning meeting ("Joint Report"), which was filed in the public record on February 26, 2004, states that the Employers would share revenue "during the term of any strike or employee lock-out related to the collective bargaining negotiations" (Joint Report, at p. 4, lines 12–14), and that the agreement persisted for "two weeks beyond the resolution of the strike . . . ." (*Id.* at 5, lines 16–17). Defendants thus themselves disclosed the timing of the revenue sharing to the public through these statements.[6]

The only remaining confidential term on Cox's list of key provisions is the revenue sharing formula itself. It is undisputed that the revenue sharing agreement's existence is public knowledge. In fact Kroger Company, which is the parent of both Ralphs and Food 4 Less, disclosed in a public report filed with the Securities and Exchange Commission ("SEC") that it paid the other Employers over $100 million under the agreement in 2003. In that SEC filing, Kroger also disclosed that this payment is properly characterized as an Operating, General and Administrative ("OG & A") expense. It is also public knowledge that the revenue sharing formula included Food 4 Less, a store not involved in the collective bargaining agreement that was the subject of the strike. Defendants themselves disclosed that fact in their statement in the Joint Report. (*Id.* at 5, lines 7–9).

The only conceivable remaining secret about the revenue sharing is the exact manner in which the shared amounts were to be calculated. Defendants have successfully kept this detail secret. According to Mr. Cox, its disclosure would enable the unions to engage in tactics to defeat or mitigate the effectiveness of the MSAA and put the Employers at a bargaining disadvantage. (LeVee Decl. Ex. G, attaching Cox Decl. at ¶ 9). However, Mr. Cox does not explain how the unions could have benefited from this information.

While the *fact* that the Employers intend to engage in revenue sharing to combat whipsawing could clearly be useful to the unions in deciding whether to selectively picket Employers or otherwise subject them to disparate economic pressure, this fact is already publicly known. Defendants have offered no explanation, much less presented any evidence, as to how knowledge of *the specific formula* would benefit the unions when the fact of revenue sharing is already known. Once knowledge of the existence of revenue sharing is parsed from the analysis, there is no showing as to any additional bargaining advantage or disadvantage attributable to the formula itself. At oral argument, Defendants were unable to offer *any* insight into how the formula would help the unions beyond the benefit already estab-

---

6. Defendants have acknowledged that MSAA paragraph 5(F) is not confidential. (*See* Defs.' Opp'n to Pl.'s Mot. to Unseal at 11 n. 8) (listing paragraphs of the MSAA that have not been publicly disclosed but omitting paragraph 5(F)). Defendants also confirmed disclosure of paragraph 5(F) at oral argument on January 24, 2005.

lished from their present awareness that the Employers engaged in revenue sharing to defeat their selective picketing of Employers during the strike. Counsel represented that Mr. Cox was being the most precise he could possibly be in his declaration. But on this record, Defendants have failed to show any reason, much less a compelling one, justifying withholding the revenue sharing formula from disclosure.

All of the provisions in the MSAA identified by Defendants as confidential, other than the revenue sharing formula, are either obvious, already disclosed by Defendants, or otherwise public knowledge. Defendants argue that there is a basic inequity in relying on the fact that many of the MSAA provisions are already public as a justification to unseal the record because most of those provisions only became public as a result of this litigation (*e.g.*, disclosures resulting from placing declarations or the Joint Report in the public record). Similarly, they argue that if this litigation had been brought during the strike, before the labor dispute had been resolved, virtually none of the MSAA provisions would be public knowledge. Since many disclosures are matters of historical fact, known from the Employers' conduct during the strike, the public would not have had the benefit of knowing the full measure of that conduct if the suit had been brought prior to the strike's resolution. The problem with these arguments is that Defendants ask the court to overlook the facts now in the record and base our decision on a hypothetical case that might have existed at some prior time. We may not decide a case based on the facts as the Employers wish they were, or as they once were. We must decide it based on the facts as they are now. As the Second Circuit recently noted in *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir.2004), a case involving a motion to unseal a summary judgment record and settlement, no matter how confidential information may have

once been, after its disclosure it is no longer so. "We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again. The genie is out of the bottle, . . . [and][w]e have not the means to put the genie back." *Id.* (citation omitted).

### 3. *Other Claimed Harm*

According to Mr. Cox, Safeway considers the MSAA's provisions to be critical components of its multi-employer negotiating strategy and has "always considered. MSAAs to be confidential collective bargaining documents . . . ." (LeVee Decl., Ex. G, attaching Cox Decl. at ¶ 7). However, he offers no factual basis or explanation for these conclusory statements. Similarly, he avers that "[m]aintaining confidentiality of the MSAAs is important because if the unions were privy to the MSAA's terms they would undoubtedly engage in tactics to defeat or mitigate the MSAA's effectiveness." Again, he offers no factual basis for this general statement. He concludes that disclosure of the MSAA "would put the Employers at a severe bargaining disadvantage and defeat the purpose of multi-employer bargaining." (*Id.* at ¶ 9). This unsupported statement, like the others, is too conclusory to satisfy the specific factual showing required by the case law.

In a separate declaration, Mr. Bohn avers that the confidentiality of the MSAA's terms is "extremely critical to maintaining an even playing field for multi-employer bargaining units in future negotiations." (LeVee Decl., Ex. H, attaching Bohn Decl. at ¶ 10). He adds that if the unions had access to the MSAA they would have an "advanced opportunity to develop and implement tactics to defeat the purpose and effectiveness of the Employers' bargaining strategies . . . [and] would be in a position to divide the multi-employer bargaining

unit ...." (*Id.*) He does not identify which provisions of the agreement are confidential, or how the unions could use any specific provision of this agreement in the future. We find his declaration to be conclusory, at best.

While Defendants assert, based on the Cox and Bohn declarations, that disclosure of the MSAA would put them at a "competitive disadvantage," they admit that the "competitors" at issue are the unions.[7] As discussed above, the confidential terms of the MSAA that Defendants identified are either already known to the unions, were disclosed by Defendants themselves during this litigation or in SEC filings, are obvious, or cannot be connected to any particular bargaining advantage for the unions, or any identifiable disadvantage to the Employers.

### 4. *Defendants' Reliance on the Protective Order*

The Employers rely heavily on Judge Segal's findings in her November 4, 2004 order on Plaintiff's motion to re-designate the MSAA as non-confidential under the protective order. As Judge Segal noted in the order, she reviewed the Employers' showing of harm only for "good cause." (Segal Order at 4). She found that the MSAA was covered by the protective order's description of "documents related in any way to [the] collective bargaining negotiations." (*Id.* at 8, citing Protective Order at ¶3b). Though she cited *NLRB v. Joseph Macaluso, Inc.*, 618 F.2d 51, 56 (9th Cir.1980) (discussing revocation of subpoena of federal mediator who participated in bargaining sessions), her order did not focus on the public interest and contained no *specific* findings about how particular provisions of the MSAA could be used by the unions in future negotiations to harm the employers. This, of course, is understandable as the parties brought a fundamentally different question before Judge Segal than the one now before us. Judge Segal considered a pure discovery issue, and there was no press intervenor asserting the public's interest. We are not bound by her findings regarding harm because she considered a different question under a different standard. She did not have to confront the problem we face here regarding the heightened standard protecting the public's right of access to documents filed in conjunction with a dispositive motion. Accordingly, Defendants' reliance on Judge Segal's discovery order to support sealing the summary judgment record is misplaced.

█ Nor are we persuaded that Defendants were "prejudiced" because they filed their summary judgment motion assuming that the protective order would prevent disclosure of the MSAA. In *San Jose Mercury News,* a case decided more than five years before Defendants filed their summary judgment motion in this case, the Ninth Circuit held that "[t]he right of access to court documents belongs to the public, and [litigants are] in no position to bargain that right away." 187 F.3d at 1101. Similarly, in *Foltz,* which was decided over a year before the filing of the summary judgment motion, the circuit expressly held that such a protective order will not rebut the presumption of public access to a summary judgment motion. 331 F.3d at 1135–36. Defendants should have known that they could not rely on the discovery protective order to bar the public's access to the summary judgment record. We find that any such reliance was unreasonable.

---

7. There is nothing in the record to suggest that the Employers would suffer any competitive disadvantage from disclosure *vis-a-vis* other competing supermarkets not participating in the multi-employer bargaining unit.

### C. *Interest in Confidential Labor Strategies*

The Employers assert that there is a well-established right to keep labor negotiation strategies confidential in order to promote the national interest in the effectiveness of the collective bargaining process. However, in the two Ninth Circuit cases cited by the Employers regarding the need for confidentiality in labor negotiations, the court did not have occasion to consider the public's right of access to court records involving summary judgment, or in an antitrust case involving alleged public injury. Defendants' cases involve confidentiality during or directly related to labor disputes, and they do not support Defendants' contention that such strategies must remain confidential *after* the dispute is resolved, even to the detriment of public access to court records. In *Harvey's Wagon Wheel, Inc. v. N.L.R.B.*, 550 F.2d 1139 (9th Cir.1976), the Ninth Circuit considered whether an employer under investigation by the National Labor Relations Board ("NLRB") for unfair labor practices could access the NLRB's investigation files through a Freedom of Information Act ("FOIA") request, while that investigation was still underway. The court analyzed the question based on NLRB disclosure rules, and the FOIA. *Id.* at 1141–42. There was no holding regarding blanket rights to keep labor negotiation strategies confidential in all circumstances, or even in the circumstances like those now before us. This case is therefore inapposite.

In *N.L.R.B. v. Joseph Macaluso, Inc.*, 618 F.2d 51 (9th Cir.1980), a company attempted to subpoena a federal mediator to provide factual testimony to an ALJ as to what had transpired during the bargaining sessions with the union. The court analyzed the question based on the policy concerns of "preservation of mediator neutrality" juxtaposed to the loss of relevant testimony. *Id.* at 54. Its analysis did not turn on the public's right of access, or the employer's right to confidentiality of negotiating strategies. The court instead focused on the importance of the "appearance of impartiality[, which] is essential to the effectiveness of labor mediation." *Id.* at 55. It held that the complete exclusion of the mediator's testimony was necessary to preserve "an effective system of labor mediation, and that labor mediation is essential to continued industrial stability, a public interest sufficiently great to outweigh the interest of every person's evidence." *Id.* at 56. This case offers no guidance on whether the Employers' right to confidential negotiation strategy exists under the circumstances of the case now before us.

In *Berbiglia, Inc.*, 233 N.L.R.B. 1476 (1977), the NLRB considered whether to revoke an employer's subpoena duces tecum for union documents, including communications between the union and its members and with other organizations, which might tend to show the union's reasons for a strike. The NLRB found that the employer was engaged in a "fishing expedition" and that forcing the union to open its files to the employer would be "subversive of the very essence of collective bargaining and the quasi-fiduciary relationship between a union and its members. If collective bargaining is to work, the parties must be able to formulate their positions and devise their strategies without fear of exposure. This necessity is so self-evident as apparently never to have been questioned." *Id.* at 1495. As authority for this proposition that had purportedly never been questioned, it cited the Ninth Circuit's decision in *Harvey's Wagon Wheel*, discussed above (which dealt with an entirely different situation involving investigatory files). This case also did not address the public's right of access, as that right was not an issue in the case.

Finally, in *Boise Cascade Corp.*, 279 N.L.R.B. 422, 1986 WL 53792 (1986), the NLRB considered whether an employer should be forced to disclose to the union the employer's study of ways to improve maintenance productivity. The study served as a basis for an overhaul of union workers' job duties. One section of the report contained statements regarding a negotiating strategy for implementing the study's proposals. The NLRB held that this portion of the report did not have to be disclosed to the union because "[a] proper bargaining relationship between the parties mandates that [the employer] be able to confidentially evaluate possible interpretations of the existing labor agreement and that it be able to plan in confidence a strategy for altering or changing its maintenance improvement program." *Id.* at 432, 1986 WL 53792. The case contains no citations for this proposition. Nor does it consider the public's right of access, or whether these confidentiality concerns would be sufficiently significant even after the labor dispute ended so as to constitute compelling reasons for overcoming the strong presumption of public access to records filed in connection with a dispositive motion.

We now consider the scope of the confidentiality interest that NLRB found "is so self-evident as apparently never to have been questioned." *See Berbiglia*, 233 N.L.R.B. at 1495. We recognize that there is a legitimate interest in maintaining the confidentiality of negotiating strategies during collective bargaining, as well as in respecting the impartiality of mediators and the integrity of NLRB investigations. Such confidentiality is likely to foster prompt resolution of labor disputes. But here, Defendants have articulated no

specific labor policy interest that would be protected by not revealing the undisclosed provisions of the MSAA, above and beyond that which is already publicly known. Moreover, in light of our prior finding that the Employers' evidence of their anticipated future use of the MSAA is both speculative and conclusory, the concerns animating all of these labor cases are only minimally present in this case. We balance the labor policy interest in the confidentiality of the Employers' hypothetical, potential future use of a "similar" MSAA on one side, and against it we weigh the fact that the labor dispute involving this MSAA is long over, there is an alleged antitrust injury to the public at issue in this litigation, and the court records involve a dispositive motion. We also weigh the fact that virtually all of the key provisions in the MSAA have already been disclosed, are obvious, or have no discernible connection to any future imbalance in bargaining positions, were they to be disclosed. We find that under the circumstances of this case, keeping the MSAA from the 2003–2004 strike confidential would advance labor policy only negligibly, if at all.

### D. The Interests of the State and the L.A. Times

The State brings this action in its capacity as *parens patriae*.[8] *See Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 447, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) (holding that a state may sue for injunction in its *parens patriae* capacity). The State argues that it has particular responsibility to inform the People of California about actions undertaken on their behalf. The State's interest here closely parallels the public interest: it seeks to inform the public on the

---

**8.** In such a capacity, the State is by definition acting in the public's interest. Under the *parens patriae* doctrine, the State acts "in its capacity as provider of protection to those

unable to care for themselves" or "prosecute[s] a lawsuit on behalf of a citizen." *Black's Law Dictionary* 1144 (8th ed.2004).

actions of the government, and on the decision of this court. It contends that the actions of the Supermarkets during the strike affected Californians in a fundamental way, and the public has a special interest in being informed of antitrust claims alleging injury to consumers.

The goal of the Sherman Act is "the prevention of restraints to free competition in business and commercial transactions which tend[ ] to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of *public injury.*" *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 373 (9th Cir.2003) (quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 84 L.Ed. 1311 (1940)) (emphasis added; original emphasis omitted). We find that the State's representation of the public's interest in access to a proceeding involving the State's allegations of *harm to the public* weighs especially heavily in favor of access.

Similarly, *LAT* argues that the press has an interest in reporting the details of this litigation, including the summary judgment motion and the court's decision thereon. We acknowledge that the press has historically served as a monitor of both the State and the courts, and it plays a vital role in informing the citizenry on the actions of its government institutions, and critiquing those institutions when necessary. *See, e.g., Times–Picayune Pub Co. v. United States,* 345 U.S. 594, 602, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) ("A vigorous and dauntless press is a chief source feeding the flow of democratic expression and controversy which maintains the institutions of a free society. By interpreting to the citizen the policies of his government and vigilantly scrutinizing the official conduct of those who administer the state, an independent press stimulates free discussion and focuses public opinion on issues and officials as a potent check on arbitrary action or abuse. ") (internal citations omitted). These interests strongly favor disclosure.

### E. *The Public Interest*

■ Defendants contend that the State and *LAT* have not shown that the public is interested in the details of the MSAA, or in the summary judgment motion. They also contend that the existing public record is sufficient to adequately inform the public about the case. Defendants' argument erroneously reverses the burden by seeking to require an evidentiary showing of the public interest. As discussed above, we strongly presume the public's interest in access and require a showing of compelling reasons to rebut it. Moreover, Defendants misapprehend the nature of the public interest at stake. The public interest undergirding the common law right of access to court records does not turn on whether the details of a particular case are "interesting," or whether a party opposing access has deemed the available information sufficient to satisfy the public's curiosity.

The public interest at issue here has a venerable heritage rooted in the need for openness in a democratic society. The courts' legitimacy in our system of government derives in large measure from our historical commitment to offering reasoned decisions publicly setting forth our rationale not only to litigants, but to the people in whose name we administer justice. As Oliver Wendell Holmes observed:

It is desirable that the trial of [civil] causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citi-

zen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).

A few years after Holmes made that observation on the Massachusetts Supreme Court, the California Supreme Court echoed a similar insight in a case involving the public's right of access. It that case, a newspaper publisher had been held in contempt for accurately reporting testimony from a marital dissolution proceeding that had been closed to the public. *See In re Shortridge*, 34 P. 227, 99 Cal. 526 (1893). The court remarked that

> [i]n this country it is a first principle that the people have the right to know what is done in their courts. The old theory of government which invested royalty with an assumed perfection, precluding the possibility of wrong and denying the right to discuss its conduct of public affairs, is opposed to the genius of our institutions in which the sovereign will of the people is the paramount idea; and the greatest publicity to the acts of those holding positions of public trust, and the greatest freedom in discussion of the proceedings of public tribunals that is consistent with truth and decency are regarded as essential to the public welfare.

*Id.* at 530–31, 34 P. 227. Indeed, historically our nation has viewed what transpires in the courtroom as public property. *NBC Subsidiary (KNBC–TV), Inc. v. Superior Court*, 20 Cal.4th 1178, 1198, 86 Cal.Rptr.2d 778, 980 P.2d 337, 351 (1999) (citing *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)).

The public interest in access to the court records addressed in these cases does not turn on how titillating a story is, how many newspapers a company sells, how many articles are published about a story, or how many members of the public come forward to express their personal interest in learning more details about it. The presumption of access exists because the citizens are entitled to observe, monitor, understand and critique their courts-even in the most mundane of cases that excite *no* media interest-because what transpires within our courtrooms belongs to our citizens in a fundamental way. This is why we require not just a showing of some possible reason to justify closure of the court to the public, but a showing of a *compelling* one.

## IV

## CONCLUSION

As set forth in detail above, we have considered and balanced all relevant factors in this case within the framework set forth by controlling precedents. Based on the record before us, we conclude that there is no factual showing that disclosure of *any* of the key provisions of the MSAA identified by Defendants would harm Defendants in future collective bargaining negotiations. Indeed, many of the provisions Defendants identified have already been disclosed or otherwise made public. Others are obvious. The key provision that has not yet been disclosed, the revenue sharing formula, has not been shown to have any discernible strategic value to unions in future negotiations. In light of this factual showing, the national labor policy favoring collective bargaining would not be meaningfully advanced by closing the court records. Moreover, against Defendants' relatively weak showing of the need for continued confidentiality of the undisclosed portions of the MSAA, there is a strong public interest in access to allegations of antitrust injury to the public, to information about government institutions' actions taken on behalf of the public, and to information about court decisions regarding dispositive motions. Similarly, the State

has a strong interest in informing its citizens about this suit that was brought on their behalf, and *LAT* has a strong interest in reporting fully and fairly on this matter. Balancing all of these factors, we conclude that Defendants have not shown compelling reasons to justify denying public access to the court's summary judgment records. Accordingly, both motions to unseal are GRANTED. We order the summary judgment briefing, and all attached exhibits unsealed, subject to the following stay.

## V

## DEFENDANTS' REQUEST FOR STAY

Defendants have requested that we grant a brief stay of any order lifting the seal to permit them to decide whether to seek emergency appellate review. We are mindful that disclosure of the court records is a bell that cannot be unrung. Thus, we hesitate to render appellate review of this matter moot by ordering disclosure of the records before Defendants can decide whether to petition the Court of Appeals for review. Nevertheless, we must also acknowledge that the summary judgment hearing is scheduled to take place soon. *LAT* has asserted that it will suffer irreparable harm if it is not permitted to report on this very timely matter of public interest as it transpires. It argues that news is perishable, and it asks that we limit the stay to the shortest possible time in order to minimize the harm it will suffer. The Ninth Circuit has recognized that where a case involves a request by the press for access to judicial records, delay "can constitute an irreparable injury." *San Jose Mercury News,* 187 F.3d at 1099. A stay of our order beyond the time of the summary judgment hearing risks causing the court records "to lose much of their newsworthiness ...." *See Valley Broad.,* 798 F.2d at 1292. *LAT* apparently seeks the court records in order to report on the summary judgment proceeding "when pre-

sumably they will pack the greatest punch ...." *Id.* (quoting *Bauman v. United States District Court,* 557 F.2d 650, 654–55 (9th Cir.1977)). Under such circumstances, any delay beyond the date that the summary judgment hearing is scheduled to take place would prejudice *LAT* "in a way not correctable on appeal." *Id.*

Moreover, we believe that we cannot hold a fair hearing on the summary judgment motion while the key documents are still under seal. We would have to choose between two equally unsatisfactory options of either excluding the press and the public from oral argument on this matter of public importance or maintaining an open courtroom and thereby severely hampering frank discussion of the merits of the summary judgment motion.

█ In order to equitably balance all of these competing concerns, we hereby STAY imposition of this ruling until Friday, February 4, 2005 at 5:00 p.m. If we have not been notified by that time that the Court of Appeals has issued an emergency stay, the seal on the summary judgement records shall be immediately lifted, the summary judgment hearing shall be open to the public, and our order on the summary judgment motion shall be filed in the public record. To accommodate this limited stay, we continue the hearing on the summary judgment motion from January 28, 2005 at 2:00 p.m. to February 10, 2005 at 9:30 a.m.

Although we have granted this limited stay to preserve Defendants' right to seek appellate review, it should be clear that we do not believe that, on balance, the question presented in these motions to unseal is close or debatable among reasonable jurists. On the record before us, Defendants fall far short of any showing that would justify denial of access. Nevertheless, out of respect for the appellate process, we decline to act in a way that would

peremptorily remove our decision from appellate review.

**IT IS SO ORDERED.**